RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0193P (6th Cir.)
File Name: 01a0193p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL SATELLITE
SPORTS, INC.,
   *Plaintiff-Appellee,*

  *v.*

ELIADIS, INC., d/b/a Melody
Lane Lounge, et al.,
   *Defendants,*

TIME WARNER
ENTERTAINMENT COMPANY,
L.P., d/b/a Time Warner
Cable,
   *Defendant-Appellant.*

Nos. 00-3013/3437

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 97-03096—David D. Dowd, Jr., District Judge.

Argued: May 2, 2001

Decided and Filed: June 11, 2001

Before: JONES, SILER, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Richard W. Clary, CRAVATH, SWAINE & MOORE, New York, New York, for Appellant. Michael J. Dell, KRAMER, LEVIN, NAFTALIS & FRANKEL, New York, New York, for Appellee. **ON BRIEF:** Richard W. Clary, CRAVATH, SWAINE & MOORE, New York, New York, E. Marie Wheeler, Akron, Ohio, for Appellant. Michael D. Slodov, JAVITCH, BLOCK, EISEN & RATHBONE, Cleveland, Ohio, Marcus W. Corwin, Skip M. Klauber, Boca Raton, Florida, for Appellee. Francine R. Strauss, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. On the night of December 14, 1996, the Melody Lane Lounge, a commercial bar located in Massillon, Ohio, showed the live broadcast of a boxing match between Riddick Bowe and Andrew Golota (the event). National Satellite Sports, Inc. (NSS) had obtained the exclusive right to broadcast the event to commercial establishments in Ohio. Time Warner Entertainment Company, L.P. had obtained the exclusive right to broadcast the event on a pay-per-view basis to its Ohio residential customers. The Melody Lane Lounge, erroneously listed as a residential customer of Time Warner, ordered the event through Time Warner's service.

After learning that the Melody Lane Lounge had shown the event to its patrons on the night in question, NSS brought suit against Eliadis, Inc., the corporate owner of the bar. The suit also named Eliadis's two owners and Time Warner as defendants. NSS alleged that the showing of the event in a commercial establishment through Time Warner's residential service constituted a violation of the Federal Communications

Act of 1934, 47 U.S.C. §§ 151-613 (Communications Act), which, among other things, prohibits the unauthorized divulgence of wire or radio communications.

Eliadis and its co-owners reached a prompt settlement with NSS. NSS and Time Warner then filed cross-motions for summary judgment against each other. The district court first granted summary judgment to NSS on the issue of liability, and subsequently entered a final judgment awarding NSS damages, costs, and attorney fees.

Time Warner appeals the district court's rulings, claiming that the court erred in failing to give preclusive effect to an adverse judgment against NSS in prior litigation between the parties on an allegedly controlling issue. In the alternative, Time Warner claims that NSS lacks standing to sue under the Communications Act and, in any event, that NSS has failed to establish a violation of that statute. For all of the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

NSS and Time Warner obtained their respective rights to broadcast the event through separate contracts. New Jersey Sports Productions, Inc., d/b/a Main Events (Main Events), produced the event. It granted Pay-Per-View Networks, Inc., d/b/a Viewer's Choice (Viewer's Choice), the exclusive right to broadcast the event to residential households. Viewer's Choice, in turn, licensed Time Warner to make the telecast of the event available to residential customers in Ohio. Main Events granted Entertainment by J&J, Inc. (EJJ) a separate exclusive right to broadcast the event to commercial establishments. NSS obtained the right to be the commercial distributor of the event's telecast in Ohio from EJJ.

Main Events created a single telecast of the event and sent it to a transmission station. From the transmission station, the

signal was sent to two different satellites. Viewer's Choice received the signal from one of the satellites. It decoded the signal, rescrambled it, and sent it to another set of satellites that transmitted the signal to a Time Warner facility in Akron, Ohio. The Akron facility, known as a "head end," receives programs via satellite and distributes them to subscribers in the Akron region. Because the event was a pay-per-view program, Time Warner encrypted it at the Akron head end so that only subscribers who had ordered the event would be able to decode and view the program.

NSS received its transmission of the telecast from a chain of distribution that traces back to the second satellite that received the initial signal from Main Events. As a result, the signals that NSS and Time Warner received in their respective Ohio facilities both originated from the same initial transmission sent by Main Events, and neither party disputes the right of the other to receive the signals in Ohio according to their separate contracts. Rather, the dispute centers on Time Warner allowing a commercial establishment to view the event on its residential-customer cable network.

Melody Lane Lounge's account was listed in the individual name of Gust Eliadis, a co-owner of Eliadis, Inc. In February of 1996, Ken Sovacool, a Time Warner employee, serviced Eliadis's cable account. Time Warner concedes that Sovacool should have recognized that the Melody Lane Lounge was a commercial establishment and not a residence. The structure of the building, an exterior identification sign, and neon beer signs in the window made this obvious. Nevertheless, having obtained residential-cable service, the Melody Lane Lounge had the capability to order pay-per-view programs.

Time Warner's account records show that Melody Lane Lounge had ordered one earlier program at the commercial rate. But Melody Lane Lounge ordered the event in question from Time Warner at the residential rate of $39.95. As a commercial establishment, Melody Lane Lounge should have

of the reasons set forth above, we **AFFIRM** the judgment of the district court.

impose any of the additional penalties provided by the statute for such a violation. *See, e.g.,* 47 U.S.C. § 605(e)(3)(C)(ii) (granting courts the discretion to increase an award of damages by an amount of not more than $100,000 for each violation of subsection (a) if the violation is willful).

According to §605(e)(3)(C)(i)(II), a party aggrieved by a nonwillful violation of § 605 may recover damages of not less than $1,000 or more than $10,000 "as the court considers just." The district court found that NSS would have received almost $1,000 if the Melody Lane Lounge had purchased the event from NSS. It further recognized that NSS paid $1,785 to investigate compliance in the Akron area with NSS's transmission rights to broadcast the event on the night in question. NSS also presented proof that it incurred approximately $1,700 in administrative costs that were necessary to identify Time Warner as the source of the Melody Lane Lounge's transmission of the event, even though this figure was not mentioned in the district court's formal findings of fact. Although the district court did not specify precisely how it arrived at the final figure of $4,500, we conclude that the proof supports the damage calculation, that the amount is well within the statutory range, and that the award is not clearly erroneous.

We also find no error in the district court's award of attorney fees and costs to NSS. Time Warner did not dispute the hourly rate charged by NSS's attorneys as unreasonable. In addition, the district court disallowed the cumulative hours charged by a second NSS attorney that it felt should not be imposed on Time Warner. We therefore find no basis to set aside the award of attorney fees and costs to NSS.

### III. CONCLUSION

In conclusion, we hold that NSS is not precluded from bringing this action against Time Warner, that NSS has standing to sue, and that NSS has established Time Warner's violation of the first sentence of 47 U.S.C. § 605(a). For all

paid NSS for the right to show the event, which would have cost it $987.50.

NSS hired investigators to visit various commercial establishments to monitor whether those showing the event had obtained the right to do so through NSS as the proper distribution channel. An investigator visited the Melody Lane Lounge on the night in question and ultimately determined that it was broadcasting the event through Time Warner's residential pay-per-view system. The Melody Lane Lounge claims that it would not have chosen to show the event had it been required to pay NSS's high commercial rate. Only 23 patrons were in the bar at the time the event was broadcast.

### B. Procedural background and prior litigation between the parties

NSS commenced its action in the United States District Court for the Northern District of Ohio in November of 1997. Eliadis, Inc. and its co-owners soon settled with NSS, agreeing to the entry of judgment against them for violating 47 U.S.C. § 605, which is part of the Communications Act, and paying $250 in nominal damages. NSS's claim against Time Warner proceeded.

In July of 1999, the district court entered summary judgment in favor of NSS, finding that Time Warner had violated § 605. A bench trial on the issue of damages was held several months later. The district court determined that Time Warner was liable for $4,500 in statutory damages. NSS further sought and was awarded attorney fees and costs pursuant to 47 U.S.C. § 605(e)(3)(B)(iii), totaling $26,389.65, in March of 2000. Time Warner appeals the rulings of the district court, raising three alternative arguments.

First, Time Warner contends that the district court erred by failing to give preclusive effect to a separate district court judgment rendered in July of 1998 that arose from a substantially identical claim by NSS against Time Warner. NSS learned that a commercial establishment in Akron, Ohio

called Lyndstalder, Inc., d/b/a Coach's Corner, had shown a boxing match between Evander Holyfield and Bobby Czyz that Coach's Corner obtained via residential-cable service from Time Warner in March of 1996. As in the case before us, Time Warner had obtained the exclusive right from the producer to distribute the match to residential customers in Ohio, while NSS received the exclusive license to sell the same program to Ohio's commercial establishments.

NSS commenced an action against Coach's Corner and its owner in the United States District Court for the Northern District of Ohio in August of 1997. When NSS learned of Time Warner's role in providing the broadcast to Coach's Corner, it added Time Warner as a defendant. In that suit, *National Satellite Sports, Inc. v. Lyndstalder, Inc. d/b/a/ Coach's Corner, et al.*, No. 5:97 CV 2039 (N.D. Ohio 1998), NSS alleged that both Coach's Corner and Time Warner had violated 47 U.S.C. § 605. Coach's Corner settled with NSS. Time Warner then filed a motion for summary judgment, alleging that NSS had failed to establish either a contractual or a statutory claim against it.

The district court held a hearing on Time Warner's motion for summary judgment in July of 1998. It issued a bench ruling at that hearing, granting Time Warner's motion for summary judgment on the basis that NSS "failed to state a claim pursuant to the terms of the contracts [for distribution] at issue in this case as well as 47 U.S.C. § 605." NSS did not appeal. Time Warner argues that the *Coach's Corner* decision precludes NSS from raising the identical § 605 claim in the present case.

Second, even if we conclude that NSS is not bound by the *Coach's Corner* decision, Time Warner argues that NSS does not qualify as a "person aggrieved" under § 605(d)(6). It therefore contends that NSS lacks the standing to sue Time Warner for an alleged violation of § 605.

Communications Act and the subsequent amendments thereto to protect the integrity of electronic communications from negligent as well as willful divulgences by intermediaries. Section 605(e), for example, distinguishes between willful and nonwillful divulgences in the setting of statutory damages. Both NSS and Time Warner were such intermediaries in the transmission of the event in question, and were only authorized to partake in the transmission insofar as their respective transmission rights authorized them to do so. Because the Melody Lane Lounge was not authorized by Main Events to receive the transmission of the event from Time Warner, Time Warner has violated the prohibitions of the first sentence of § 605(a).

**E. The district court's findings of statutory damages, attorney fees, and costs were not clearly erroneous**

Finally, Time Warner challenges the district court's award of $4,500 in statutory damages to NSS and its order for Time Warner to pay NSS's attorney fees and costs in the sum of $26,389.65. It argues that the amount of damages was disproportionate, especially in light of what NSS's measure of damages would have been under state contract law. The district court held a hearing in order to assess NSS's damages and issued two separate memorandum opinions on this issue. It first determined the amount of damages according to its authority under 47 U.S.C. § 605(e)(3)(C)(i)(II), and explained its award in an eight-page opinion dated December 19, 1999. It then calculated the award for attorney fees and costs under 47 U.S.C. § 605(e)(3)(B)(iii), setting forth its reasoning in a four-page opinion dated March 23, 2000.

Time Warner's basic argument is that the award is grossly disproportionate to any harm suffered by NSS. The district court, however, provided a detailed account of its findings of fact and conclusions of law with regard to the calculation of damages. Significantly, it found that Time Warner did not willfully violate the statute, and therefore the court did not

*Id.* at *6.

We thus conclude that even though Time Warner did not intercept the communication in question, it nonetheless divulged the telecast of the event to an unauthorized addressee in violation of the first sentence of § 605(a). Time Warner, however, makes a compelling argument that it did not violate the third sentence of § 605(a). According to that sentence, "*[n]o person not being entitled thereto* shall receive or assist in receiving any interstate or foreign communication by radio and use such communication . . . for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a) (emphasis added).

We read the clause "no person not being entitled thereto" as referring to persons who were never authorized to receive the communication in question. Unlike the first sentence of § 605(a), which looks at the relationship between the original sender and the ultimate receiver in determining whether the communication is authorized, the third sentence only applies to persons who were never authorized to be in possession of the communication in the first place.

Time Warner does not fit within this definition, because it was contractually authorized to receive the communication of the event at its head end in Akron and to further relay that communication to its residential customers in the area. We therefore cannot agree with the district court that Time Warner violated the prohibition enunciated in the third sentence of § 605(a). Nonetheless, Time Warner is unable to escape liability under the first sentence of § 605(a) for divulging the communication that it was authorized to distribute on a limited basis only, when one of the recipients of that transmission was an unauthorized addressee of Main Events, the sender.

Although Time Warner protests that this outcome results in a federal mandate of infallibility on the part of cable operators, we believe that Congress enacted the

Finally, as its last line of defense, Time Warner argues that NSS's cause of action under § 605 fails because Time Warner did not "intercept" a communication within the meaning of the Communications Act. It maintains that the clear purpose of the Act is to prohibit and punish acts of communications piracy, which is far removed from what Time Warner says occurred in the present case. Although Time Warner concedes that NSS may have a claim against it based on state-law breach of contract, it argues that NSS has pursued the wrong cause of action under § 605.

## II. ANALYSIS

### A. Standard of review

We review de novo the district court's grant of summary judgment. *See, e.g.*, *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

We will not disturb a district court's determination of an award for damages unless clearly erroneous. *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994).

## B.  NSS is not bound by the decision in *Coach's Corner*

NSS brought suit in both this case and in the *Coach's Corner* case under 47 U.S.C. § 605. Section 605 defines what constitutes the unauthorized publication or use of electronic communications. It includes such prohibited practices as the divulgence of wire or radio communications by persons authorized to receive them to others who are not so authorized, and the interception of any radio communication by a person not authorized to receive that communication from the sender. *See* 47 U.S.C. § 605(a). According to § 605, "[a]ny person aggrieved by any violation of subsection (a) of this section . . . may bring a civil action in a United States district court or in any other court of competent jurisdiction." 47 U.S.C. § 605(e)(3)(A). Furthermore, the statute directs that "the term 'any person aggrieved' shall include any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming." 47 U.S.C. § 605(d)(6).

In its motion before the court in *Coach's Corner*, Time Warner argued that it was entitled to summary judgment because NSS was not a "person aggrieved" within the meaning of § 605(d)(6), and could therefore not pursue a claim for an alleged violation of § 605(a). NSS responded by arguing that standing to sue under § 605 is not limited to those who meet the statutory definition of a "person aggrieved."

The district court granted Time Warner's motion for summary judgment in the *Coach's Corner* case. In articulating its reasoning from the bench on July 13, 1998, the court held that NSS had failed to state a claim under *both* the contracts at issue in that case *and* under 47 U.S.C. § 605. The pertinent parts of the *Coach's Corner* ruling were as follows:

(D. Md. 1993). That court, faced with a similar fact pattern to the one in *Cablevision*, held that

> [e]ven assuming, as these defendants contend, that there was no 'interception' here because [the bar] was 'authorized' by [the residential distributor] to receive the Event on a pay-per-view basis, defendants still have violated the Act because they clearly were not authorized to then broadcast the Event to the patrons of a commercial establishment such as [the bar]. . . . [T]he first and third sentences of [§ 605(a)] do not . . . require an 'interception' of a cable transmission and clearly proscribe the unauthorized divulgence or use of communications which have been 'received' legally for certain purposes.

*Id.* at 999.

A similar conclusion was reached in the unreported case of *Joe Hand Promotions v. D.M.B. Ventures, Inc.*, Nos. CIV.A 93-2656, CIV.A. 93-3141, 1995 WL 328399 (E.D. La. May 31, 1995) (unpublished table decision). In *Joe Hand Promotions*, Cox Cable had the exclusive right to distribute a boxing match to its residential customers via pay-per-view programming, while Joe Hand Promotions had the exclusive right to distribute the event to commercial establishments. Just as NSS has sued Time Warner in the case before us, Joe Hand Promotions sued Cox Cable for providing the broadcast of the event to several commercial establishments that were erroneously receiving residential service from Cox Cable. *See id.* at *2. That court held as follows:

> It is undisputed that Cox Cable received the pay-per-view event satellite signal, divulged the satellite signal via coaxial cable to three commercial establishments not authorized to receive the event, and that it received payment from the restaurants. These facts are sufficient to impose liability under the first and third sentences of Section 605(a).

is unavailing.  In *Cablevision*, a distributor with exclusive rights to broadcast a boxing match to commercial establishments sued a sports bar under § 605 that had improperly obtained the boxing match from a residential pay-per-view service. *Cablevision* cited *Smith* for the proposition that when "there [is] no interception, the mere fact that the bar divulged or published [a similar boxing match] cannot make it liable under Section 605(a)." *See id.* at *4 (citing *Smith,* 475 F.2d at 741) (original alterations and internal quotation marks omitted).

For the reasons previously discussed, however, this proposition is not a correct statement of the law.  *Smith*'s holding is limited to an interpretation of the second sentence of § 605(a), not the entire provision.  As a result, *Cablevision*'s reliance on the broad dicta from *Smith* is misplaced.  Because *Cablevision* is an unpublished decision, we are not bound by its holding.  *See McCloud v. Testa*, 97 F.3d 1536, 1559 n.36 (6th Cir. 1996).

We are bound, however, to properly apply the first sentence of § 605(a).  An authorized intermediary of a communication (such as Time Warner) violates the first sentence of § 605(a) when it divulges that communication through an electronic channel to one "other than the addressee" intended by the sender (such as Main Events).  Time Warner responds by arguing that at all times it was transmitting the event through fully authorized channels.  But this is incorrect, because Time Warner was not authorized to transmit the event to commercial establishments.

When viewed in this light, we conclude that the district court did not err in holding that Time Warner violated the first sentence of § 605(a).  The district court found that Time Warner had improperly divulged the communication of the event to the Melody Lane Lounge, an "addressee" that was not authorized by Main Events to receive it from Time Warner.  This conclusion finds support from the case of *That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 995

With regard to the ruling, [NSS] has failed to state a claim pursuant to the terms of the contracts at issue in this case as well as 47 United States Code Section 605.
    . . . .
    Paragraph 14(e) of the Television Licensing Agreement provides for the enforcement of unauthorized display of the closed circuit television feed.  That also provides that Joe Hand Promotions [the licensor of the event] could not assert any piracy claim without prior notice.
    [The agreement] provides that a sublicensee [NSS] has no rights to enforceability, quote, "It being understood that your sublicensee shall have no right to commence or settle any claim or litigation hereunder."
    The other relevant agreement is the March 12, 1996 Closed Circuit Television Agreement entered into between [the licensor] and [NSS].
    That agreement at paragraph 7 provides that there is no right to a piracy action to be pursued by [NSS].
    [NSS's] effort to overcome the language of the contract does not create a material fact for trial.

Time Warner now argues that the district court below should have given preclusive effect to the earlier ruling in *Coach's Corner*.  It claims that *Coach's Corner* determined that when a commercial establishment shows a sporting event ordered through a residential-cable service rather than properly paying the fees exacted by the commercial distributor, the distributor does not have standing to sue the authorized residential-service provider under § 605.  NSS obviously disagrees.

Our circuit has held that a prior decision shall have preclusive effect on an issue raised in a later case if four elements are met:

(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
(2) determination of the issue must have been necessary

to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Smith v. SEC*, 129 F.3d 356, 362 (6th Cir. 1997) (en banc) (quoting *Detroit Police Officers Ass'n v. Young*, 824 F.2d 512, 515 (6th Cir. 1987)).

In the present case, the district court concluded that Time Warner had failed to establish the second and fourth elements of this test. Because Time Warner and NSS disagree as to whether these four elements were met, an analysis of each is necessary in order to decide if the district court erred by failing to give preclusive effect to the *Coach's Corner* decision.

### 1. Identity of issues

Time Warner argues that the *Coach's Corner* court was faced with the precise threshold question that the district court encountered in the current case. This question is whether NSS has standing to sue under § 605; in particular, whether NSS had a proprietary interest in the communication that was sent from Time Warner via its authorized residential-cable service to its pay-per-view customers. Time Warner further contends that the bifurcation of the satellite transmission of the Holyfield/Czyz boxing match at issue in *Coach's Corner* was identical to the manner in which the event in question was sent to Time Warner and NSS in Ohio on December 14, 1996.

NSS counters that there is no identity of issues in these two cases. First, it contends that the transmissions at issue in *Coach's Corner* are distinguishable from the ones involved in the present case. Specifically, Time Warner distributed the Holyfield/Czyz boxing match to its residential customers through its Home Box Office (HBO) service, not through a pay-per-view network. The difference is that all residential

electronic transmission. That § 605 protects both the transmission and its contents is consistent with the statutory definition of a "communication." *See, e.g.,* 47 U.S.C. § 153(a) (stating that a "communication by wire" is a "transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection.").

Both NSS and Time Warner had contracted with distributors authorized by Main Events for the right to obtain a transmission of the event on the night of December 16, 1996. The difference between their rights was that NSS contracted for the right to distribute the communication to commercial establishments, while Time Warner obtained the right to relay the communication to residential customers. As such, both parties had proprietary interests in the *transmission* of the *content* of the boxing match, regardless of the satellite transfers or encryptions that the transmissions underwent in the process.

Given that NSS had a proprietary interest in the transmission of the event, the next question is whether Time Warner "intercepted" that communication. We conclude that it did not. The Supreme Court has defined an interception for the purposes of § 605 to be a "taking or seizure by the way or before arrival at the destined place." *Goldman,* 316 U.S. at 134. Under this definition, Time Warner did not intercept the communication at issue. Rather, it simply redirected the authorized transmission of the event to its subscribers who ordered the program, including one, the Melody Lane Lounge, that was incorrectly listed as a residential customer.

But the absence of an "interception" does not get Time Warner off the hook of § 605. As previously explained, Time Warner's reliance on *Smith v. Cincinnati Post & Times-Star*, 475 F.2d 740 (6th Cir. 1973), and *Bufalino v. Michigan Bell Telephone Co.*, 404 F.2d 1023 (6th Cir. 1968), is misplaced. Similarly, Time Warner's citation to *Cablevision of Michigan, Inc. v. Sports Palace, Inc.*, No. 93-1737, 1994 WL 245584 (6th Cir. June 6, 1994) (unpublished table decision),

even if an interception is not a required element of the violation.

To start with, Time Warner argues that NSS had no proprietary right in the telecast that Time Warner was distributing. Essentially, according to Time Warner, an electronic *transmission* can be severed from the *content* of the material that is being transmitted. To support the view that § 605 only protects the physical means of a transmission and not its content, Time Warner cites *Goldman v. United States*, 316 U.S. 129, 134 (1942), *overruled on other grounds by Katz v. United States*, 389 U.S. 347 (1967). The Court in *Goldman* stated that "[t]he protection intended and afforded by the [original Communications Act] is of the *means of communication*." 316 U.S. at 133 (emphasis added).

But *Goldman* actually supports the conclusion that the Communications Act was designed to protect the content of a transmission as well. In that case, federal agents used nonelectronic eavesdropping instruments to listen to conversations in an enclosed room by persons who were eventually indicted for conspiracy to violate the Bankruptcy Act. *See id.* at 130-31. One of those defendants argued that the federal agents had violated the Communications Act by overhearing and divulging the contents of what he said while on the telephone. Holding that such overhearing and divulging was not a violation of § 605, the Court stated:

> What is protected is the message itself throughout the course of its transmission by the instrumentality or agency of transmission. Words written by a person and intended ultimately to be carried as so written to a telegraph office do not constitute a communication within the terms of the Act until they are handed to an agent of the telegraph company.

*Id.* at 133.

The above passage underscores the protection provided by § 605 to the message's content once it is in the pipeline of an

HBO subscribers had access to view the Holyfield/Czyz match, whereas only the residential customers who ordered the Bowe/Golota event through the pay-per-view network could view the program. Second, NSS argues that the licensing agreements as between Time Warner and NSS were fundamentally different.

We believe that Time Warner's argument is the more persuasive on this "identity of issues" element. Although HBO and pay-per-view are different subscriber services, the key issue in both cases is the same – the consequences of a commercial establishment gaining access to view a boxing match by being inaccurately listed as a residential customer of Time Warner. As a result, Time Warner has satisfied the first element for issue preclusion.

### 2. Necessary to the outcome of the prior proceeding

The district court held that Time Warner failed to establish that NSS's lack of standing under § 605 was necessary to the grant of summary judgment for Time Warner in *Coach's Corner*. It determined that the *Coach's Corner* decision was instead primarily based on the conclusion that NSS was contractually barred from pursuing an action against Time Warner because of the particular language in the license agreements involved in that case. As such, it held that the alternative ground in *Coach's Corner* for granting Time Warner's motion for summary judgment – namely, that NSS was not a "person aggrieved" under § 605 – was not necessary to that court's judgment.

Time Warner argues that the district court erred in reaching this conclusion. It notes that *Coach's Corner* is a case in which two alternative but independent grounds support the court's ultimate judgment. Time Warner claims that under the "weight of federal authority, a plaintiff is precluded from relitigating an issue actually decided against it in a prior case, even if the court in the prior case rested its judgment on alternative grounds." It cites the Second, Seventh, Ninth, and

D.C. Circuits as upholding this general principle of issue preclusion. *See Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir. 1977); *Magnus Elecs., Inc. v. La Republica Argentina*, 830 F.2d 1396, 1402 (7th Cir. 1987); *In re Westgate-California Corp.*, 642 F.2d 1174, 1176 (9th Cir. 1981); *Yamaha Corp. of America v. United States*, 961 F.2d 245, 255 (D.C. Cir. 1992).

This principle of issue preclusion, however, is counterbalanced by courts and commentaries that have adopted the opposite conclusion. For example, the American Law Institute (ALI) endorses NSS's position that "[i]f a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments § 27 cmt. i (1980). Furthermore, one leading commentary describes the Restatement's view as the "new" and "modern" rule. *See* 18 James Wm. Moore et al., Moore's Federal Practice ¶ 132.03[4][b] at 132-111 to 132-113 (3d ed. 1997). At least four circuits (the Third, Fourth, Eighth, and Tenth) have adopted this modern rule. *See Arab African Int'l Bank v. Epstein*, 958 F.2d 532, 535 (3d Cir. 1992); *Ritter v. Mount St. Mary's College*, 814 F.2d 986, 993-94 (4th Cir. 1987); *Baker Elec. Co-Op v. Chaske*, 28 F.3d 1466, 1475-76 (8th Cir. 1994); *Turney v. O'Toole*, 898 F.2d 1470, 1472 n.1 (10th Cir. 1990). In addition, the Seventh Circuit has embraced the modern rule in the context of the Black Lung Benefits Act in *Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1008 (7th Cir. 1997) (en banc), without citing its contrary holding in *Magnus Electronics*, 830 F.2d at 1402.

The issue is a close one given the policy implications involved. Time Warner argues that by not recognizing *Coach's Corner* as precluding relitigation of whether NSS has standing to sue under § 605, NSS is free to relitigate the same issue again. NSS counters by arguing that because the *Coach's Corner* court decided that NSS was contractually

effect, or meaning of such intercepted communication to any person." 47 U.S.C. § 605(a).

This court affirmed the dismissal of Bufalino's complaint, concluding that there was no intercepted communication involved. *Bufalino*, 404 F.2d at 1027. Consequently, *Bufalino*'s statement that "[i]n order to constitute a violation of Section 605 there must be both an interception and a divulgence," *id.*, though worded expansively, is properly confined to an interpretation of the second sentence of § 605(a). The statements from *Smith* and *Bufalino* that purportedly limit the scope of § 605 are thus overly broad, taken out of context, and therefore not definitive in determining the applicability of § 605 to the present circumstances. *See Coca-Cola*, 822 F.2d at 30.

In conclusion, we find no merit in Time Warner's argument that NSS does not have standing to sue under § 605. We agree with the district court that the plain language of the word "include" in § 605(d)(6) does not render the definition of a "person aggrieved" an exclusive one. Furthermore, the legislative history of the amendments to the Communications Act in 1984 and 1988 reveals that Congress intended to bring cable and satellite communications under the protection of that Act by expanding, not limiting, the group of persons who have standing to sue for its violation. Consequently, we hold that the definition of a "person aggrieved" in § 605(d)(6) is nonexclusive, and that the district court did not err in determining that NSS had standing to sue Time Warner under § 605.

**D. Time Warner violated the first sentence of § 605(a)**

Time Warner next argues that the district court erred in holding Time Warner liable for violating § 605(a). First, it contends that an interception is required to state a claim for a violation under that section. Second, it maintains that it is not liable under either the first or third sentences of § 605(a),

Smith sued both the newspaper and Wunker. The decision in *Smith*, a two-page per curiam opinion, primarily discusses Smith's claim under the Federal Wiretap Law, 18 U.S.C. § 2520, which it found inapplicable. It then summarily concluded that Smith's claim under § 605 must also be dismissed, "since that section is violated only when a person both intercepts and divulges a communication, which is not the case in regard to this defendant." *Id.* at 741 (citing *Bufalino*, 404 F.2d at 1027).

Because Wunker was the intended addressee/recipient of Smith's telephone conversation and no "interception" of a communication was involved, § 605 was not implicated by the fact situation in *Smith*. As such, the broad statement in *Smith* to the effect that § 605 requires both an interception and divulgence of a communication is dicta, because it was not necessary for the disposition of that case. *See Coca-Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 30 (6th Cir. 1987) (holding that a prior case's sweeping language regarding a section of the Lanham Act was not binding where it only addressed a narrow issue thereunder and failed to address other issues arising within the same section).

*Bufalino* is also distinguishable. In that case, William Bufalino was a residential customer of a Michigan telephone company. Two company linemen were working on a telephone pole to transfer lines in a cable box. Because one of the servicemen had incomplete information, he tried to call the office by connecting to an unknown line in the cable box. In actuality, he called Bufalino's residence. Bufalino then sued the Michigan telephone company, alleging that its workers had illegally tapped into his home telephone line in violation of § 605. His complaint specifically alleged a violation of the second sentence of § 605 only, which is now the second sentence of § 605(a) as a result of the amendments contained in the Cable Communications Policy Act of 1984. According to that sentence, "[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport,

barred from pursuing a claim against Time Warner, NSS had no incentive to appeal that court's secondary decision that NSS failed to state a claim under § 605.

We find NSS's point persuasive because, while it might have won the "battle" over § 605, NSS would almost surely have lost the "war" in being unable to overcome the contractual prohibition on commencing litigation against Time Warner. Furthermore, the district court's oral ruling in *Coach's Corner* transcribes into only a two-paragraph conclusory statement regarding NSS's claim under § 605, which was far overshadowed by the balance of its three-page discussion outlining the contractual obstacles that prevented NSS from suing Time Warner.

This circuit has not decided whether alternative grounds for a judgment are each "necessary to the outcome" for the purposes of issue preclusion in a subsequent case involving only one of the grounds. Based on the actual decision in *Coach's Corner*, we do not find it necessary to fully resolve this issue at the present time. We do hold, however, that where, as in *Coach's Corner*, one ground for the decision is clearly primary and the other only secondary, the secondary ground is not "necessary to the outcome" for the purposes of issue preclusion. *Coach's Corner*'s secondary holding that NSS failed to state a claim under § 605 was thus not necessary to the granting of Time Warner's motion for summary judgment.

### 3. Final judgment on the merits

Although the district court held that the *Coach's Corner* decision was a final judgment on the merits for the purpose of issue preclusion, NSS argues that it was not. In particular, it claims that the court's judgment in *Coach's Corner* was a dismissal of NSS's suit without prejudice for failure to state a claim. This argument is without merit. *Coach's Corner* granted Time Warner's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Furthermore, the district court made clear that its judgment was final. It recognized that "both parties will more than likely have a disagreement over everything I say, pretty much, and you can take it up to the Sixth Circuit and they can tell us whether I was right or wrong." Finally, summary judgment is recognized as a final judgment for the purpose of issue preclusion. *See Mayer v. Distel Tool & Mach. Co.*, 556 F.2d 798 (6th Cir. 1977) (holding that where the facts and legal theory of a complaint are identical to those of a previous complaint, a grant of summary judgment on the prior complaint is a final judgment and could be the basis for issue preclusion in a subsequent case). Time Warner has therefore satisfied this third element for issue preclusion.

### 4. Full and fair opportunity to litigate

Turning to the final element, Time Warner contends that the district court in *Coach's Corner* granted its motion for summary judgment after full briefing and argument, and that both parties had a sufficient opportunity to litigate the § 605 issue before that court. NSS, however, argues that the district court in *Coach's Corner* primarily focused on the question of whether NSS's license agreement contractually barred it from initiating a suit against Time Warner. It therefore contends that the question of whether NSS had a proprietary right in the communication under § 605 was secondary. The district court agreed with NSS.

We believe that Time Warner has the more persuasive argument on this issue. Nothing in the *Coach's Corner* case prevented either NSS or Time Warner from raising all potential arguments about the applicability of § 605 to the circumstances of their case. Despite the contractual language that was ultimately held to bar NSS from raising a claim against Time Warner in *Coach's Corner*, NSS still had a full and fair opportunity to litigate the claim that it raised under § 605. As such, we conclude that Time Warner has satisfied this final element for issue preclusion.

§ 605(a) does not involve the interception of a communication at all. It prohibits intermediaries who are *authorized* to receive a communication by wire or radio from divulging the contents of the transmission to any person other than the addressee intended by the sender.

Our circuit has previously recognized Congress's intent to expand rather than contract the reach of the Communications Act when it amended § 605:

In view of [promoting the growth of satellite programming and facilitating individual reception of unencrypted satellite signals], Congress amended the Communications Act to authorize the receipt of unscrambled satellite programming for private viewing[, w]hile *leaving intact the prohibitions against unauthorized use of radio or wire communications contained in 47 U.S.C. § 605(a).*

*Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir. 1994) (emphasis added). Time Warner, however, argues that § 605 "is violated only when a person both intercepts and divulges a communication," citing *Smith v. Cincinnati Post & Times-Star*, 475 F.2d 740 (6th Cir. 1973), and *Bufalino v. Michigan Bell Telephone Co.*, 404 F.2d 1023 (6th Cir. 1968). The district court acknowledged these older precedents in a footnote, but distinguished them on the basis that they were both decided before the 1984 and 1988 amendments to the Communications Act. Both cases are also distinguishable on their facts.

*Smith*, for example, involved an employee of the Domestic Relations Court in Hamilton County, Ohio who had a telephone conversation with Howard Wunker, a private citizen. The court employee told Wunker that he could arrange a "fix" in a divorce case pending in that court. Wunker recorded this conversation and released the recording to the local newspaper, which published the contents of the Smith-Wunker conversation. *See Smith*, 475 F.2d at 740-41.

aggrieved" under § 605(d)(6), the purpose of the amendment was explained as follows:

> Section 5 of [the Satellite Home Viewer Act of 1988] amends [§ 605] of the Communications Act pertaining to the piracy of satellite cable programming. The Committee's amendment is intended to deter piracy practices by (1) stiffening applicable civil and criminal penalties, (2) *expanding standing to sue*, and (3) making the manufacture, sale, modification . . . of devices or equipment with knowledge that its primary purpose is to assist in unauthorized decryption of satellite cable programming expressly actionable as a criminal act.

H.R. Rep. No. 100-877(II), at 28, *reprinted in* 1988 U.S.C.C.A.N. 5638, 5657 (emphasis added).

Limiting the availability of civil actions to those persons who meet the definition of a "person aggrieved" in § 605(d)(6), and requiring that they have "proprietary rights in [an] intercepted communication," is inconsistent with the intent of Congress as expressed in the Cable Communications Policy Act of 1984 and the Satellite Home Viewer Act in 1988. Both acts were intended to expand the scope of protection provided by the Communications Act, not limit it. In particular, Time Warner's argument flies in the face of Congress's explicit interest in "expanding standing to sue" under the Act. By adding satellite communications under the protection of § 605, along with wire and radio communications, Congress sought to make clear that those with "proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming," 47 U.S.C. § 605(d)(6), have standing to sue.

But this explicit reference to a subset of persons aggrieved was not intended to exclude others who sustain injuries from a violation of any of the prohibitions originally listed in § 605(a). In particular, the prohibition in the first sentence of

In sum, we agree with the district court that the second element ("necessary to the outcome") set forth in *Smith v. SEC*, 129 F.3d 356, 362 (6th Cir. 1997) (en banc), has not been met, but disagree that the fourth element ("full and fair opportunity to litigate") was lacking. But because all four elements of *Smith* must be satisfied before the prior opinion will be given preclusive effect, NSS is not bound by the decision in *Coach's Corner*. We therefore turn to the issues of whether NSS has standing to sue under § 605 of the Communications Act and whether it has sufficiently established a claim against Time Warner for a violation of that Act.

**C.  NSS has standing to sue Time Warner because the definition of a "person aggrieved" in § 605(d)(6) is nonexclusive**

Congress enacted the Cable Communications Policy Act of 1984 to address "a problem which is increasingly plaguing the cable industry – the theft of cable service." H.R. Rep. No. 98-934, at 83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720. This statute amended and supplemented the Communications Act. *See id.* The 1984 legislation added subsections (b)–(e) to § 605. These new provisions were intended to address "the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations." *See* 1984 U.S.C.C.A.N. at 4745. The original prohibitions contained in § 605, however, were retained without amendment in what is now codified at § 605(a).

Section 605(a), therefore, lists the types of unauthorized publication or use of electronic communications that have been prohibited since the Communications Act first became law. It sets forth separate prohibitions in each sentence. The first sentence states:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or

foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception . . . to any person other than the addressee, his agent, or attorney. . . .

47 U.S.C. § 605(a).  The second sentence of § 605(a) prohibits piracy as is it traditionally understood:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

*Id.*  Finally, the third sentence provides:

No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

*Id.*

Congress has criminalized the unauthorized interception of communications prohibited by § 605(a).  *See* 47 U.S.C. § 605(e)(1).  Subsection (e) also provides for private civil enforcement of § 605 as now amended.  *See* 47 U.S.C. § 605(e)(3)(A) ("Any person aggrieved by any violation of subsection (a) of this section . . . may bring a civil action in a United States district court or in any other court of competent jurisdiction.").  As a result, § 605 sets forth both civil and criminal penalties for its violation.  *See* 47 U.S.C. § 605(e).  Furthermore, § 605(e) designates varying penalties, depending on whether or not a violation of the section was willful.  The term "person aggrieved" was not defined when § 605(e)(3)(A) was originally enacted.

Section 605 of the Communications Act was further amended by the Satellite Home Viewer Act of 1988, Pub. L. No. 100-667, § 205, 102 Stat. 3959-60.  That Act amended § 605 by adding the following definition of a "person aggrieved" to § 605(d):

(d) Definitions
   For purposes of this section – . . .
   (6) the term "any person aggrieved" shall include any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming. . . .

47 U.S.C. § 605(d)(6).  The Communications Act elsewhere defines a "communication by wire" as a "transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection," 47 U.S.C. § 153(a), and a "communication by radio" as a "transmission by radio of writing, signs, signals, pictures, and sounds of all kinds," 47 U.S.C. § 153(b).

Time Warner contends that Congress would not have amended § 605 to add the definition of "any person aggrieved" if it had intended to grant broad standing to anyone potentially injured by the statute.  Rather, Time Warner argues that Congress intended to *limit* standing to sue under § 605 to those who meet the definition of a "person aggrieved" under § 605(d)(6).  As a result, Time Warner claims that the district court erred in concluding that NSS had standing to sue under § 605.

The district court held that the use of the word "include" in the statutory phrase "any person aggrieved shall *include* any person. . ." does not mean that *only* persons who meet that definition have standing to sue.  We agree.  The district court's interpretation is consistent with the legislative history of § 605(d).  In the House Report accompanying the 1988 amendment to § 605 that added the definition of "person