United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 9, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-20751

DIRECTV INC,

Plaintiff-Appellee,

versus

JEFF BUDDEN,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, BARKSDALE, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Jeff Budden purchased and distributed over 100 devices that are primarily used to illegally gain access to satellite services. Budden appeals the district court's grant of summary judgment against him on a civil claim for violations of 47 U.S.C. § 605(e)(4), which prohibits distributing devices "knowing or having reason to know" that they are primarily of assistance in the unauthorized decryption of satellite services. We affirm.[1]

I

---

[1] We heard oral argument in this case on May 11, 2005, with two related cases, which are also issued today. *See DIRECTV, Inc. v. Robson*, No. 04-30861, --- F.3d ---- (5th Cir. Aug. 9, 2005); *DIRECTV, Inc. v. Minor*, No. 04-50793, --- F.3d ---- (5th Cir. Aug. 9, 2005).

DIRECTV, Inc. ("DTV") is a nationwide provider of direct-to-home satellite programming, including movie channels, sports, major cable networks, and local channels.  DTV offers products on both a subscription and pay-per-view basis, and it encrypts--that is, digitally scrambles--its satellite broadcasts to guard against unauthorized access.  A typical system consists of a small DTV-compatible satellite dish, a DTV receiver (also known as an "integrated receiver/decoder" or "IRD"), and a DTV access card. The dish connects to the receiver, which in turn connects to the user's television.  A DTV access card, when inserted into the receiver, allows the receiver to decrypt the various channels or services that the user has purchased.  A DTV access card is a smart card, similar in size and shape to a credit card, and also contains an embedded computer and memory.

Numerous "pirate access devices"[2] have been developed to circumvent the necessity of a valid access card, thereby allowing users to illegally decrypt the DTV satellite signal and thus obtain DTV programming without purchasing it.  Such piracy can take various forms, including modifying a valid access card or using a device to take the place of a valid access card.

In order to combat the proliferation of illegally modified

---

[2] *See DIRECTV, Inc. v. Nicholas*, 403 F.3d 223, 224 (4th Cir. 2005) ("pirate access devices" are those devices "that can surreptitiously steal DIRECTV's transmissions"); *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 816 (11th Cir. 2004) ("pirate access devices" are those used "to circumvent this conditional access technology and allow users to receive the satellite transmissions provided by DTV without paying DTV any fees"); *see also DIRECTV, Inc. v. Barnes*, 302 F. Supp. 2d 774, 776 (W.D. Mich. 2004).

access cards, DTV periodically sends out electronic countermeasures ("ECMs") embedded within its satellite transmissions. ECMs detect and disable modified access cards.[3] However, as something of a "counter-countermeasure," a device called a "bootloader" is specifically designed to overcome the effects of an ECM, allowing individuals to continue using modified access cards to pirate DTV's transmissions. A bootloader is a printed circuit board that is inserted in place of a valid access card, and is used in conjunction with a modified access card. According to the affidavit of Bill Gatliff, on behalf of DTV, a bootloader is "solely designed for the purpose of circumventing DIRECTV's conditional access system, and thus is only of assistance in the unauthorized decryption of DIRECTV's satellite transmissions of television programming."

The late Hayden Black, a long-time acquaintance of Budden, asked Budden to help him purchase several bootloader devices from Mountain Electronics, an internet retailer. Budden agreed. Black directed Budden to the Mountain Electronics website and told him how to order the devices. Black gave Budden cash to pay for the order and asked Budden to have the devices shipped to Budden's address rather than to Black's home. Budden, using the alias Jeff Brown, placed the order on August 4, 2001. The shipment arrived COD. Budden paid for it with a money order--purchased with cash

---

[3] One particularly effective ECM, sent out by DTV on January 21, 2001, is known as "Black Sunday" in the pirate community.

from Black--and accepted the package.  Budden then passed the devices along to Black.

Over the course of the next several months, the process was repeated, as Black requested Budden's assistance in placing several additional orders.  As to these subsequent orders, however, Budden insisted that Black himself obtain the money order.  Between August 2001 and November 2001 Budden placed five orders with Mountain Electronics for a total of 115 bootloaders.  Eventually, Budden became uncomfortable with the situation and told Black that he did not wish to place any additional orders.  According to Budden, at the time of these events he had no knowledge of the nature of bootloaders; he did not read any description of a bootloader on the Mountain Electronics website and was concerned only with placing the orders; and Black had only indicated to him that the devices were "parts for satellites."

DTV brought several claims against Budden for piracy, only one of which is directly at issue here: a claim for violation of 47 U.S.C. § 605(e)(4).[4]  The district court held that the actions Budden admitted to constituted distribution of devices that Budden had reason to know were primarily for piracy, in violation of § 605(e)(4).[5]  Accordingly, the district court granted summary

---

[4] Counts 1 and 2 alleged violations of 47 U.S.C. §§ 605(e)(4) and 605(a). Counts 3-6 implicated 18 U.S.C. § 2511, 18 U.S.C. § 2512, conversion, and TEX. CIV. PRAC. & REM. CODE § 123.002.

[5] *See DIRECTV, Inc. v. Budden*, No. 4:03-CV-5666 (S.D. Tex. Aug. 11, 2004) (unpublished).

4

judgment to DTV on this claim, but did not explicitly address DTV's other claims.  Budden timely appeals.

## II

## A

We first examine our jurisdiction.  DTV argues that, because the district court only disposed of DTV's § 605(e)(4) claim, the decision below was not final, and thus, in turn, we lack jurisdiction under 28 U.S.C. § 1291.  We disagree.

It is true that the district court only explicitly addressed the § 605(e)(4) claim.  It is also true that, in general, when a district court only addresses one claim or party in a multi-claim or multi-party situation, the judgment is not final unless the court abides by the provisions of Rule 54.[6]  Here, the district court did not, per Rule 54, "(1) expressly determine[] that there

---

[6] *Hardin v. M/V Ben Candies*, 549 F.2d 395, 396 (5th Cir. 1977) ("When more than one claim for relief is involved in an action, the resolution of a single claim is not appealable unless the district court expressly determines that there is no just reason for delay and expressly directs the entry of judgment." (citing FED. R. CIV. P. 54(b))).
Rule 54 provides in part:
> When more than one claim for relief is presented in an action . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an *express determination that there is no just reason for delay and upon an express direction for the entry of judgment*.  In the absence of such determination and direction, any order or other form of decision, *however designated*, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

FED. R. CIV. P. 54(b) (emphasis added).

is no just reason for delay, and (2) expressly direct[] entry of a judgment."[7]

However, these facts fall by the wayside where all of the remaining claims have already been abandoned and the district court intended to dispose of all claims before it.[8] In determining finality, we have "advocated a practical interpretation that looked to the intention of the district court" and held that "if the judgment reflects an intent to dispose of all issues before the district court, we will characterize that judgment as final."[9] In *National Association of Government Employees v. City Public Service Board* we found that, to the extent the district court had not explicitly addressed certain claims, those claims had been abandoned.[10] Specifically, "[i]n disposing of all Plaintiffs' other claims, therefore, the district court undoubtedly believed that it was disposing of the entire case before it," and it was "clear that no one associated with this case believed there to be a live

---

[7] *Huckeby v. Frozen Food Express*, 555 F.2d 542, 545 (5th Cir. 1977); *see id.* at 545-46 ("In the absence of a certification by the district court that meets these two requirements, a partial disposition of a multi-claim or multi-party action does not qualify as a final decision under Section 1291 and is ordinarily an unappealable interlocutory order." (footnote omitted)).

[8] *See Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 705-06 (5th Cir. 1994); *Vaughn v. Mobil Oil Exploration & Producing S.E., Inc.*, 891 F.2d 1195, 1198 (5th Cir. 1990).

[9] *Nat'l Ass'n of Gov't Employees*, 40 F.3d at 705; *see also Vaughn*, 891 F.2d at 1197 ("The intention of the judge is crucial in determining finality.").

[10] 40 F.3d at 705-06.

6

[remaining] claim when judgment was entered."[11]  Similarly, in *Vaughn v. Mobil Oil Exploration & Producing Southeast, Inc.*, we found a summary judgment to be final, holding that "[w]e can only construe appellee's failure to urge its claims before the district court as an intention to abandon that part of its case" and that the abandonment, therefore, left a final and appealable judgment without the aid of Rule 54(b).[12]

There are several indications here that DTV had abandoned all claims except for the § 605(e) claim upon which the district court ruled in its summary judgment motion, and that the district court intended to treat them as such.  First, the district court had directed DTV to file a motion for summary judgment by July 16, 2004, if the parties did not settle.  When DTV finally filed its summary judgment motion on July 21, 2004, it only addressed claims under § 605(e)(4), which suggests that the other claims were abandoned.  Budden pointed this out in his response to DTV's motion for summary judgment and argued that all other claims had been abandoned.[13] Second, although the district court's summary judgment opinion only addressed the "claims that Budden unlawfully distributed devices used to pirate its signal" as per § 605(e)(4),

---

[11] *Id.* at 706.

[12] 891 F.2d at 1198.

[13] Budden, in the alternative, made a cross-motion for summary judgment on Counts 3 to 6.  Budden reiterates the abandonment point in his brief on appeal, arguing that "[i]n its [summary judgment] motion [DTV] abandoned all of its claims other than alleged violations of 47 U.S.C. § 605(e)(4) and made no attempt to demonstrate unlawful interception of communications by Budden."

7

it entered a "Final Judgment" and closed the case.[14] While Rule 54 indicates that the label "Final Judgment" would not necessarily make the judgment final when other live claims were present, such labeling *does* illuminate the district court's intent and, combined with the other indications, bolsters our conclusion that the district court treated the claims it disposed of as the only live claims. Third, in its brief, DTV acknowledges that "it was DIRECTV's intention to abandon all claims other than the claims brought under 47 U.S.C. § 605, on which the district court granted summary judgment."

In sum, it is clear that DTV abandoned all other claims, that the district court treated the § 605(e)(4) claim as the only remaining live claim, and that the judgment is final. Accordingly, we have jurisdiction.

B

Budden argues that DTV lacks standing because it is not a "person aggrieved" for purposes of bringing a § 605(e)(4) claim.[15] We disagree.

Section 605(e)(4) provides in relevant part:

> Any person who manufactures, assembles, modifies, imports, exports, sells, or *distributes* any electronic, mechanical, or

---

[14] *See Vaughn*, 891 F.2d at 1197-98; *cf. McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 350-51 (5th Cir. 2004) (per curiam) (no abandonment by party and no intent by district court to end litigation).

[15] *See* 47 U.S.C. § 605(e)(3)(A). Budden raised this argument in the district court, and that court implicitly rejected it.

other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by [§ 605(a)] shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both.[16]

A civil action for violation of this section arises under § 605(e)(3)(A), which provides that "[a]ny person aggrieved by any violation of [§ 605(a)] or [§ 605(e)(4)] may bring a civil action in a United States district court or in any other court of competent jurisdiction."[17]  Looking solely to this provision, there is no contention that DTV would not have standing, given that it claims to be "aggrieved" by a distribution of pirate access devices in violation of § 605(e)(4).[18]

---

[16] 47 U.S.C. § 605(e)(4) (emphasis added).  With the Cable Communications Policy Act of 1984 (CCPA), Pub. L. No. 98-549, 98 Stat. 2779, Congress amended the Communications Act of 1934, ch. 652, 48 Stat. 1064.  Prior to the CCPA, § 605 only contained the prohibitions currently found in § 605(a) (unauthorized interception, reception, transmission, and publication); however, with the CCPA, Congress expanded the statute to include, *inter alia*, the predecessor of § 605(e)(4) (then codified at § 605(d)(4)).  *See* CCPA § 5(a), 98 Stat. at 2802-03.  In 1988, Congress again amended the statute--altering § 605(e)(4) to read substantially as it does today; altering § 605(e)(3)(A) to refer to § 605(e)(4); and adding § 605(d)(6).  *See* Satellite Home Viewer Act of 1988 (SHVA), Pub. L. No. 100-667, tit. II, § 205, 102 Stat. 3949, 3959-60; *see also* Public Telecommunications Act of 1988, Pub. L. No. 100-626, § 11, 102 Stat. 3207, 3211-12 (redesignating subsections).  For further historical context, see *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 200-06 (3d Cir. 2001); *Edwards v. State Farm Ins. Co.*, 833 F.2d 535, 537-38 & nn.3-4 (5th Cir. 1987).

[17] 47 U.S.C. § 605(e)(3)(A).

[18] There would similarly be no barrier posed by constitutional standing requirements.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *cf. DIRECTV, Inc. v. Treworgy*, 373 F.3d 1124, 1127 (11th Cir. 2004) (noting possible constitutional difficulties were 18 U.S.C. § 2520 to be read as giving civil cause of action against a defendant for mere possession of pirate access device).

However, there is a twist.  Section 605(d)(6) provides instruction with respect to the phrase "any person aggrieved" as follows:

> [T]he term "any person aggrieved" shall include any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming, and, in the case of a violation of [§ 605(e)(4)], shall also include any person engaged in the lawful manufacture, distribution, or sale of equipment necessary to authorize or receive satellite cable programming.[19]

Budden contends that § 605(d)(6) is an exhaustive list of those who have standing--that is, that this provision serves a limiting function.  Budden then argues that neither clause of § 605(d)(6) applies because there is no showing here that there was an "intercepted communication" and because "satellite cable programming" does not include "direct-to-home satellite services" such as that of DTV.[20]  However, we are persuaded that the plain language of § 605(d)(6), in particular the phrase "shall include," does not limit the broad scope of § 605(e)(3)(A).

First, in the past, we have held that "[t]he word 'includes'

---

[19] 47 U.S.C. § 605(d)(6).  Congress added this language in 1988.  *See* SHVA § 205, 102 Stat. at 3959; discussion *supra* note 16.

[20] *See* 47 U.S.C. § 605(d)(6); 47 U.S.C. § 605(d)(1) (defining "satellite cable programming" as "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers"); *see also* 47 U.S.C. § 605(e)(4) (listing both "satellite cable programming" and "direct-to-home satellite services").

is usually a term of enlargement, and not of limitation."[21]  This largely tracks earlier Supreme Court expressions that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."[22]

Second, this interpretation fits with common dictionary definitions and examples.  One version defines "include" as meaning "[t]o have as a part or member; be made up of, at least in part; contain" or "[t]o contain as a minor or secondary element."[23]  That dictionary provides a telling contrast between "include" and "comprise":

> *Include* and *comprise* both take as their objects things or persons that are constituent parts.  *Comprise* usually implies that all of the components are stated: *The track meet comprises 15 events . . . .  Include* can be so used, but . . . <u>more often implies an incomplete listing</u>: *The meet includes among its high points a return match between leading sprinters.*[24]

A similar example in another dictionary indicates the non-exclusive nature of "include," as in the phrase "*included* a sum for tips in his estimate of expenses."[25]

---

[21] *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968) (internal quotation marks and citation omitted).

[22] *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941).

[23] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 665 (1976).

[24] *Id.* (underline emphasis added).

[25] WEBSTER'S THIRD NEW WORLD DICTIONARY 1143 (1961).  We are comfortable applying the common meaning here given the expectation that, having created a normative standard of conduct and a civil enforcement mechanism for any persons aggrieved,

11

Third, the Sixth Circuit has spoken to this issue and reasoned that "the plain language of the word 'include' in § 605(d)(6) does not render the definition of a 'person aggrieved' an exclusive one."[26]  A number of district courts have agreed.[27]  In *DIRECTV, Inc. v. Hoverson*, for example, the court held that § 605(d)(6) is not an exclusive list: "§ 605(d)(6) is not a true definition but, instead, merely is a description of two categories of persons who come within the broad term 'any person aggrieved.'"[28]  In support of its position, the court contrasted the usage of the word "includes" in § 605(d)(6) with the word "means," which was used in describing

---

had Congress intended to limit that universe to less than what is constitutionally permissible, it could have clearly done so, rather than using the typically non-limiting word "include" in this context.

[26] *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 914 (6th Cir. 2001); *see id.* at 911-14; *cf. Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 129 (2d Cir. 1996) (mentioning in passing that § 605(e)(3)(A) "provides a civil action to '[a]ny person aggrieved by any violation of [§ 605(a)] or [§ 605(e)(4)]'" without indicating that this broad provision was limited and without making reference to § 605(d)(6)); *In re Cases Filed by DIRECTV, Inc.*, 344 F. Supp. 2d 647, 657 (D. Ariz. 2004) (similar).

[27] *See, e.g.*, *DIRECTV, Inc. v. Hoverson*, 319 F. Supp. 2d 735, 738-39 (N.D. Tex. 2004); *DIRECTV, Inc. v. Boonstra*, 302 F. Supp. 2d 822, 829 n.4 (W.D. Mich. 2004).  On the other hand, at least one court has indicated that § 605(d)(6) is a restrictive definition. *See DIRECTV, Inc. v. Morris*, 357 F. Supp. 2d 966, 972 (E.D. Tex. 2004) ("47 U.S.C. § 605(e)(3)(A) . . . permits an aggrieved party, *as defined in 605(d)(6)*, to obtain civil relief . . . ." (emphasis added)); *id.* ("An aggrieved party must have an interest in a communication which is intercepted.").
Of course, finding standing where a plaintiff meets the terms of § 605(d)(6), even were it to be read as an exhaustive list, is not difficult. *See e.g.*, *DIRECTV, Inc. v. Deskin*, 363 F. Supp. 2d 254, 258 & n.1 (D. Conn. 2005) (DTV "is a person aggrieved within the meaning of section 605(d)(6)" as to § 605(a) claim for actual interception).  In the present case, we need not determine whether DTV falls within § 605(d)(6).

[28] *Hoverson*, 319 F. Supp. 2d at 739.

other terms.[29]  Similarly, in *DIRECTV, Inc. v. Boonstra*, the court noted that "the statute does not limit the definition of 'aggrieved' persons only to those expressly identified in the definition.  Rather, the use of the word 'include' is non-limiting and indicates that it is a non-exclusive description of potential plaintiffs."[30]

In sum, § 605(d)(6) does not serve the limiting function that Budden ascribes to it--that is, it is not an exhaustive list.[31]  DTV has standing to bring the § 605(e)(4) claim as a "person aggrieved."[32]

III

A

We review a grant of summary judgment *de novo*, applying the same standard as the district court.[33]  "Summary judgment is proper when the pleadings and evidence demonstrate that no genuine issue

---

[29] *Id.; compare* 47 U.S.C. § 605(d)(6) *with* 47 U.S.C. § 605(d)(1), (3) & (4).

[30] 302 F. Supp. 2d at 829 n.4.

[31] As such, Budden's additional argument regarding the failure of Congress to add the clause "or direct-to-home satellite services" to § 605(d)(6) is unavailing.  *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 205, 110 Stat. 56, 114 (adding "or direct-to-home satellite services" to § 605(e)(4), but not to § 605(d)(6)).

[32] We note that the report accompanying the 1988 amendment that added § 605(d)(6), *see* discussion *supra* note 16, indicated that its purpose was, in part, "expanding standing to sue."  H.R. REP. No. 100-877(II) (1988), at 28, *reprinted in* 1988 U.S.C.C.A.N. 5638, 5657; *see United States v. Harrell*, 983 F.2d 36, 39-40 (5th Cir. 1993); *see also Nat'l Satellite Sports, Inc.*, 253 F.3d at 912.  This sentiment comports with our interpretation of § 605(d)(6).

[33] *See Boudreaux v. Swift Transp. Co., Inc*., 402 F.3d 536, 540 (5th Cir. 2005); FED. R. CIV. P. 56.

13

of material fact exists and the movant is entitled to judgment as a matter of law."[34]  "An issue is material if its resolution could affect the outcome of the action."[35]  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[36]  When considering summary judgment evidence, we view all facts, and the inferences to be drawn from them, in the light most favorable to the nonmovant.[37]

B

Budden argues that the affidavit of James Whalen was not competent summary judgment evidence.[38]  According to his affidavit, Whalen, a Senior Director for DTV's Office of Signal Integrity, is "familiar with the usual and customary business practices involved in all aspects of DIRECTV's investigations of individuals and businesses suspected of illegally obtaining access to DIRECTV programming."  He describes how, on December 11, 2001, and April 18, 2002, law enforcement officials, with the assistance of DTV

---

[34] *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) (citing FED. R. CIV. P. 56(c)).

[35] *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[36] *Boudreaux*, 402 F.3d at 540 (citing *Anderson*, 477 U.S. at 251-52).

[37] *Id.*; *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

[38] Budden makes this argument in the context of asserting that summary judgment should have been granted to *him*, rather than to DTV, on the § 605(e)(4) claim.  However, Budden made no cross-motion for summary judgment in the district court on this claim; his cross-motion only addressed claims 3 to 6.  We nonetheless consider the viability of the Whalen affidavit because it impacts the propriety of the district court's grant of summary judgment in favor of *DTV*.

personnel, executed search warrants upon the owners of Mountain Electronics. Whalen explains that Mountain Electronics was a "business enterprise focused on distributing electronic devices primarily designed for the surreptitious interception of satellite communications broadcast by DIRECTV," and that Mountain Electronics marketed its bootloaders as such. DTV uses this evidence to bolster its case that Budden knew or had reason to know that the devices were primarily for piracy, asserting that in affirmatively going to the Mountain Electronics website, Budden would have likely seen a description of the bootloader devices.

Budden attacks Whalen's statement by pointing out that, while it is a sworn affidavit, it does not state that his testimony is based on personal knowledge, nor does it aver that the statements therein are true and correct. These arguments are unavailing.

1

First, it is true that Rule 56 requires that summary judgment affidavits be based on personal knowledge: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[39] Nonetheless, while an affidavit certainly *can* explicitly state that it is based on "personal

---

[39] FED. R. CIV. P. 56(e).

knowledge,"[40] there is no requirement for a set of magic words.  As to competency, for example, we have held that in the summary judgment context, even when a party's response is a verified pleading that "does not affirmatively state in the document itself that the [persons] are competent to testify as to the facts to which they swore," it "does not necessarily doom their testimony."[41]

Similarly, the Fourth Circuit squarely rejected the argument that the "affidavits in the record are defective because they do not state that they are based on personal knowledge and do not affirmatively state that the affiants are competent to testify to the matters stated therein."[42]  The Ninth Circuit has also found it proper in the summary judgment context for district courts to rely on affidavits where the affiants' "personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they

---

[40] *See, e.g.*, *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002) (holding that, "based on [affiant's] personal knowledge and his position with [the company], it was not an abuse of discretion for the district court to consider the information contained in the affidavits," where affiant stated that he was Director of Claims, that he had personal knowledge of the facts, and that he had access to and had reviewed the company's records as they pertain to information contained in the affidavits).
In contrast, an affidavit cannot affirmatively state that it is only based on "information and belief." *Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003) ("Because Dengel's affidavit is expressly based merely on information and belief, it is struck as not based on personal knowledge and therefore fails the requirements of summary judgment evidence.").

[41] *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987); *see id.* ("We have previously held that verified pleadings may in some circumstances be treated as affidavits in support of a motion for summary judgment." (internal quotation marks and citation omitted)).

[42] *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 n.9 (4th Cir. 2002).

16

swore."[43]

Here, it is reasonably within Whalen's position--what one court has called his "sphere of responsibility"--as a Senior Director of Signal Integrity for DTV to be familiar with the Mountain Electronics investigation as described in his affidavit.[44] We decline to find Whalen's affidavit deficient for lack of personal knowledge, as it is reasonably inferred.

2

Second, there is no requirement that sworn affidavits have a statement that the contents are "true and correct." That incantation is required for *unsworn* declarations. When confronted with an unsworn declaration, we have held that because the "affidavit is neither sworn nor its contents stated to be true and correct nor stated under penalty of perjury," it was not proper summary judgment evidence.[45] We explained:

> It is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment. A statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for an affiant's oath if the statement contained therein is made "under penalty of perjury" and verified

---

[43] *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990).

[44] *Hodges v. Exxon Corp.*, 563 F. Supp. 667, 669-70 (M.D. La. 1983); *see also Ondis v. Barrows*, 538 F.2d 904, 907 n.3 (1st Cir. 1976) (finding personal knowledge requirement met based on the affiant's position in the company).

[45] *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305-06 (5th Cir. 1988).

17

as "true and correct."[46]

Here, the lack of a recitation that the statement is "true and correct" poses no barrier for the Whalen affidavit. Budden's attack on the affidavit is without merit.

C

According to Budden, a reasonable finder of fact could conclude that DTV's evidence did not show that Budden distributed the bootloaders "knowing or having reason to know" the illicit nature thereof, in violation of § 605(e)(4). We again disagree.

While Budden contests whether he knew or had reason to know, he does not contest the actual nature of the bootloaders. On this latter point, the affidavits on behalf of DTV provide the only evidence, indicating that bootloaders are primarily used for piracy.[47] In other words, while Budden's knowledge of bootloaders is contested, Budden does not dispute that bootloaders are devices that are "primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite

---

[46] *Id*. at 1306 (footnote omitted).

[47] Bill Gatliff's affidavit reads:
> A bootloader is solely designed for the purpose of circumventing DIRECTV's conditional access system, and thus is only of assistance in the unauthorized decryption of DIRECTV's satellite transmissions of television programming. A bootloader has no purpose or use other than to modify the behaviors of P2/H access cards that were previously modified and subsequently disabled by the Black Sunday ECM. Bootloaders thereby circumvent DIRECTV's conditional access system.

18

services."[48]  Budden also does not contest that his actions constitute "distribut[ion]" within the meaning of § 605(e)(4).

As to the knowledge requirement, Budden denies knowing the nature of the bootloaders prior to this suit.  According to Budden, he did not read a description of the devices on the Mountain Electronics website, and his friend Black kept him in the dark.

Budden's attempt to create a fact issue as to his knowledge by relying on a conclusory and self-serving affidavit is on unsteady ground.[49]  However, even crediting Budden's testimony, as did the district court below, summary judgment in favor of DTV was still proper because a reasonable person *had reason to know* in the circumstances of this case that the bootloaders being purchased are devices primarily for piracy.  That is, § 605(e)(4) does not demand actual knowledge; constructive knowledge will suffice.

Budden admitted that Black asked him to order a number of bootloader devices from the website of Mountain Electronics, and that Budden did so.  DTV has also presented uncontroverted evidence that Mountain Electronics markets the bootloaders *as* pirate access devices.  In total, Budden ordered (over the course of five

---

[48] 47 U.S.C. § 605(e)(4).

[49] *See BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (affirming summary judgment for plaintiffs where "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant"); *see also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for plaintiff where defendant's only evidence consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment" (internal quotation marks and citation omitted)).

separate orders), payed for (using Black's money), accepted shipment of, and distributed 115 bootloader devices. Budden's protestations of ignorance notwithstanding, whether or not he had actual knowledge, a person who undertakes such concerted and repeated efforts to secure and distribute these devices "ha[s] reason to know" what they are.[50] Remaining willfully blind does not absolve Budden of the knowledge that a reasonable person would have acquired in these circumstances. In a different context the Supreme Court long ago remarked: "It should be remembered that a purchaser will have notice whenever he has the means of knowledge, although he may choose not to know; or, in other words, whenever it may fairly be presumed that he either knew or remained wilfully ignorant."[51] Such sentiments echo true today.

The fact that Budden used an alias in placing the orders and eventually, after placing and distributing five orders of bootloaders, refused to place any more only strengthens our conclusion that he had reason to know the nature of the devices. In the present case, given the volume of devices ordered by Budden and the number of orders placed--even though relatively little time was expended--in combination with the other evidence mentioned, we are persuaded that a rational trier of fact could not find for Budden. Accordingly, the district court did not err in granting

_____

[50] 47 U.S.C. § 605(e)(4).

[51] *Robbins v. Chicago City*, 71 U.S. (4 Wall.) 657, 668 (1867) (internal quotation marks and citation omitted).

summary judgment in favor of DTV.

                                    IV

To summarize, we have jurisdiction to consider this appeal; DTV has standing as a "person aggrieved" to bring a claim for violation of § 605(e)(4); the Whalen affidavit is competent summary judgment evidence; and summary judgment in favor of DTV was proper.

AFFIRMED.

21