# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 17, 2011

No. 10-70021

Lyle W. Cayce
Clerk

BRITT ALLEN RIPKOWSKI

Petitioner - Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:07-CV-4097

Before DAVIS, SMITH, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Petitioner Britt Ripkowski appeals the dismissal of his petition for habeas
corpus relief in the district court. We affirm.

I.

**The Crime**

The Texas Court of Criminal Appeals set forth the evidence supporting
Ripkowski's capital murder conviction on direct appeal as follows:

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-70021

Monica Allen and [Ripkowski] dated for awhile but had a stormy relationship. Allen had a two-year-old daughter, Dominique Frome, from a prior relationship. [Ripkowski] had lived with Allen at various times in Salt Lake City, Utah and in Houston, Texas. At the time of the events giving rise to this prosecution, they were living apart, with [Ripkowski] in Houston and Allen in Salt Lake City. On December 22, 1997, a young woman's body was found by the side of a roadway near Monticello, Utah. The body was not identified at that time. On December 30th, a missing persons report was filed on Allen and her daughter. The FBI and the Salt Lake City Police Department (SLCPD) began an investigation of the disappearances. Detective Kelly Kent of the SLCPD was one of the officers assigned to investigate. On January 15, 1998, the body found in Utah was identified as Allen's.

The following day, Special Agent Gary Steger, with the Houston Division of the FBI, contacted [Ripkowski] at his apartment in Houston. Steger and another FBI agent introduced themselves and told [Ripkowski] that they were investigating the disappearance of Allen and her child. They talked with [Ripkowski], received his permission to search the apartment, and conducted a search that revealed nothing of importance to the investigation. Special Agent Steger did see a crack pipe in the apartment. That same day, [Ripkowski] called Detective Kent, with whom he had past dealings. [Ripkowski] told Kent that he, Allen, and Dominique had left Salt Lake City together but parted ways at St. George, Utah on December 21st. [Ripkowski] called Kent again on January 19th. This time he told her that he had taken Dominique to Houston and that a friend had taken her to Mexico.

On January 20th, [Ripkowski] called Kent and told her that he had been in contact with the FBI and he believed that they were following him. That same day, the FBI searched [Ripkowski]'s apartment pursuant to a federal search warrant. [Ripkowski] told Special Agent Steger the revised story of taking Dominique to Houston and a friend taking her to Mexico. [Ripkowski] said that he had used Allen's van to drive from Salt Lake City to Houston, and he told FBI agents where the van was located. The van was seized by the FBI and Special Agent Steger returned [Ripkowski] to his apartment.

2

No. 10-70021

On January 22nd, [Ripkowski] was arrested by federal agents. Special Agent Eric Johnson read [Ripkowski] his Miranda warnings and transported him to the Houston FBI office. Johnson testified that he did not threaten [Ripkowski] or make any promises. Johnson denied that [Ripkowski] was disoriented during this time period. During a pat-down search of [Ripkowski], Johnson discovered some phone cords and a necktie. During transit, [Ripkowski] told officers that he should have made them kill him.

[Ripkowski] was turned over to Special Agent Steger at the Houston FBI office. Steger noticed that [Ripkowski] had some scratches on his face and an injury to his wrist. The wrist injury consisted of a one-sixth of an inch deep slash across the wrist. [Ripkowski] told Steger that he had tried to slit his wrists the night before. Steger took [Ripkowski] to a nurse for medical treatment. Afterwards, [Ripkowski] was placed in an interrogation room for questioning. Also present in the interrogation room were Special Agent Steger, Detective Kent, and Charles Oliver, a homicide investigator for SLCPD. Steger read the Miranda warnings. Oliver testified that Steger read each warning individually, and after each one, Steger asked [Ripkowski] if he understood his rights. [Ripkowski] appeared to understand his rights and appeared to knowingly, intelligently, and voluntarily waive the rights. Oliver further testified that [Ripkowski] did not appear to be under the influence of drugs or alcohol. When asked questions, [Ripkowski] responded coherently and appropriately. After warnings were read and rights waived, Detective Kent interviewed [Ripkowski].

Kent also testified that [Ripkowski] appeared to understand the warnings. Kent observed that [Ripkowski] read the waiver of rights form aloud and that [Ripkowski] appeared to voluntarily, knowingly, and intelligently waive his rights. No promises, threats, or abuse of any kind occurred before or during the interrogation. According to Kent, [Ripkowski] did not appear to be under the influence of drugs or alcohol, he appeared to understand what was going on, and when asked questions, he responded appropriately. This first interview by Kent was not electronically recorded. During the interview [Ripkowski] admitted to killing both Allen and Dominique. [Ripkowski] related that, on December 24th, he killed Dominique, put her body in a suitcase, and buried the suitcase in an

No. 10-70021

undeveloped area near the Sheldon Reservoir in northeast Harris County.

[Ripkowski] agreed to help locate Dominique's body. He went with law enforcement agents to the area he described and they attempted to find the victim's body. But the terrain was swampy and covered with underbrush, and [Ripkowski] exhibited confusion about the body's location. Several law enforcement agents testified that they believed [Ripkowski] was honestly trying to help locate the body but was unsuccessful. [Ripkowski] informed officers that the body could be further up the same road about a half mile.

After this failed attempt to find the child's body, Steger took [Ripkowski] to the homicide division of the Houston Police Department. [Ripkowski] was placed in an interview room with Detective Kent and Houston Police Officer Robert King. King testified that he read [Ripkowski] the required warnings and [Ripkowski] nodded his head after each individual warning was read. Both King and Kent testified that [Ripkowski] appeared to understand his rights and appeared to waive those rights voluntarily. Kent then conducted a videotaped interrogation of [Ripkowski]. Kent and King both testified that [Ripkowski] did not appear to be under the influence of drugs or alcohol during the interrogation and that [Ripkowski] responded appropriately to questions. During the interrogation [Ripkowski] again described how he killed Allen and Dominique and again described how he disposed of Dominique's body. [Ripkowski] also stated that he had used cocaine extensively up to and just prior to arrest, that he had recently attempted suicide by trying to slit his wrists, and that he had tried to kill himself by taking an overdose of pills shortly before his arrest. After the taping ended, [Ripkowski] was shown a map, and he pointed out the area on the map where Dominique's body was located.

On January 23rd, armed with this information, law enforcement agents found Dominique's body.

*Ripkowski v. State*, 61 S.W.3d 378, 382-383 (Tex. Crim. App. 2001).

**Procedural History**

4

No. 10-70021

Ripkowski was convicted of capital murder of Dominque, a child under the age of six. After a separate punishment hearing, he was sentenced to death. The Texas Court of Criminal Appeals affirmed on direct appeal. *Id.* The Supreme Court denied cert. *Ripkowski v. Texas*, 539 U.S. 916 (2003).

Ripkowski filed a state application for writ of habeas corpus while his direct appeal was pending. The trial court's findings of fact and conclusions of law were adopted by the Texas Court of Criminal Appeals which denied relief. *Ex parte Ripkowski*, No. WR-65,238-01, 2006 Tex. Crim. App. Unpub. LEXIS 225 (Tex. Crim. App. Nov. 22, 2006).

Ripkowski then filed this federal habeas petition raising multiple claims. The district court granted the director's motion for summary judgment denying Ripkowski's claims and denied his request for a certificate of appealability. After Ripkowski filed a motion to alter or amend the judgment, the district court granted COA on the following issue: Whether Ripkowski was entitled to a stay of these federal habeas proceedings because of incompetence.

In this appeal, Ripkowski continues to argue for a stay of these proceedings on the basis of his incompetence and he seeks a COA on five of the grounds urged in the district court. For the reasons assigned below, we affirm the district court's judgment denying the motion to stay and affirm the district court's denial of COA on the remaining issues.

## II.

On federal habeas appeal, the district court's findings of fact are reviewed for clear error and the district court's conclusions of law are reviewed *de novo*. *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001). Under 28 U.S.C. § 2254(d), a federal court cannot grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The statute permits a federal habeas court to assess only the state court's decision, not the propriety of its analysis and reasoning. *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003). Under AEDPA, "a determination of a factual issues made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). A federal habeas petitioner "has the burden of rebutting this presumption with clear and convincing evidence." *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)).

Ripkowski filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Accordingly, the petition is subject to the requirements imposed by AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997). Under AEDPA, Ripkowski must obtain a COA before he can appeal the district court's denial of habeas relief. *See* 28 U.S.C. § 2253(c); *see also Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). The district court granted COA on one issue - whether Ripkowski is entitled to stay these habeas proceedings because he is incompetent.

The district court denied Ripkowski's petition for COA on the remaining issues raised in this appeal. Accordingly, his only alternative is to petition this court directly for a COA. *See* 28 U.S.C. § 2253(c). "To determine whether a COA should be granted requires an overview of the claims in the habeas petition and a general assessment of their merits." *Summers v. Dretke*, 431 F.3d 861, 870 (5th Cir. 2005); *Miller-El*, 537 U.S. at 336. This court looks to the district court's application of AEDPA to petitioner's constitutional claims and asks whether that resolution was debatable among jurists of reason. *Miller-El*, 537 U.S. at 336. "This threshold inquiry does not require full consideration of the factual or legal basis adduced in support of the claims. In fact, the statute forbids it." *Id.*

No. 10-70021

Obtaining a COA requires a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *e.g. Miller-El,* 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  An applicant usually must demonstrate that "jurists of reason could disagree with the district court's resolution of his claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Moreno v. Dretke*, 450 F.3d 158, 163 (5th Cir. 2006); *Miller-El*, 537 U.S. at 327.  Where the district court dismisses the application based on procedural grounds without reaching the prisoner's underlying constitutional claim(s), the showing is expanded.  *See Hall v. Cain,* 216 F.3d 518, 521 (5th Cir. 2000).  In that situation, the applicant must show that jurists of reason would find it debatable whether: (1) the petition states a valid claim of the denial of a constitutional right; and (2) the district court was correct in its procedural ruling.  *Id.*; *see also Slack*, 529 U.S. at 484. "The question is debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342.  Moreover, "[b]ecause the present case involved the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

### III.

Ripkowski argues that he is incompetent to assist his counsel in this habeas proceeding and that this proceeding must be stayed until he regains the competence to proceed.  As we stated in *Mines v. Dretke*,

> Neither the Supreme Court nor this court have [*sic*] determined whether such a right exists, whether the right is constitutional or statutory, what standard of review applies, or in what procedural manner such a right would be properly asserted.

7

No. 10-70021

118 Fed. Appx. 806, 811 (5th Cir. 2004). We need not decide in this case whether such a right exists or any related issues, because Ripkowski, like Mines, has failed to present evidence showing that he is presently incompetent.

The district court found that "Ripkowski presents no evidence that he presently is incompetent." We agree. Ripkowski presented two affidavits and his attorney's allegations of his incompetence in his petition to support his claim of incompetence. The first affidavit is from Dr. Rahn K. Bailey, M.D.[1] Dr. Bailey's affidavit states the following conclusions:

1. Mr. Ripkowski is diagnosed as being Bipolar I with psychosis;

2. Mr. Ripkowski appeared to have been suicidal during trial;

3. Mr. Ripkowski was incompetent at the time he gave his statement to the police and when waiving his trial rights;

4. Mr. Ripkowski is incompetent and cannot assist his attorney now;

5. Mr. Ripkowski is incompetent to be executed.

The affidavit states that it is based on a review of the trial record and Ripkowski's medical records and an examination of Ripkowski for approximately 2.5 hours. However, it does not state when the examination occurred or describe the standards on which he judged incompetence or how Ripkowski failed to meet that standard.

The timing of Dr. Bailey's analysis is very important in this case. We start with the findings of the state habeas court that Ripkowski was competent at trial based on the affidavits of his trial attorneys that Ripkowski was able to assist in the preparation of his defense and understand the proceedings. Also, the state habeas court ordered that Ripkowski be examined by two court

---

[1] The state argues that this affidavit is not competent summary judgment evidence due to various technical defects in the affidavit because it is not sworn before a notary or other authority. 28 U.S.C. § 1746; *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305-06 (5th Cir. 1988); *DIRECTV, Inc. v. Budden*, 420 F.3d 571 (5th Cir. 2005). We need not decide this issue because the affidavits, even if credited, do not support a claim of present incompetence.

No. 10-70021

appointed experts to determine his then present mental capacity for purposes of his claim that he was incompetent to be executed. Based on the reports of these experts the state habeas court found that Ripkowski failed to prove then present incompetence. Thus, any finding that Ripkowski is incompetent now must be based on information not presented to the state habeas court and based on a change in Ripkowski's condition since that time. Dr. Bailey's affidavit fails in this respect because it does not indicate when he examined Ripkowski. In addition, the affidavit itself is undated. This in conjunction with the failure to indicate the standard of incompetence considered and applied to Dr. Bailey's examination of Ripkowski renders the affidavit general and conclusory and insufficient to support a finding of incompetence or even trigger a hearing on the issue.

The second affidavit is from Jennifer Danielle Turner, a law student working as a clerk with Ripkowski's habeas counsel. The affidavit states that Ripkowski is "impossible to interview" and they "have been unable to gather any useful information from him to help in investigating his case." The affidavit also comments on his hygiene. Aside from the problems of resting a medical diagnosis on the affidavit of a layperson, the affidavit does not offer any analysis of Ripkowski's ability to communicate, only that he has not done so. Ripkowski also points to his numerous filings in the district court that are incomprehensible. These scribblings do not establish legal incompetence.

In summary, the right on which Ripkowski rests his claim is questionable, and the evidence of his alleged present incompetence is insufficient to raise a serious factual question about Ripkowski's present mental state. Relief is not warranted on this issue.

IV.

Ripkowski also requests a certificate of appealability on the following issues, on which the district court denied COA.

9

No. 10-70021

A.

Ripkowski first argues that he is incompetent to be executed. He recognizes that this issue is not timely at present but alerts the court that it is likely to be a continuing concern. COA is not appropriate on this claim.

B.

Ripkowski argues that his serious mental impairments render his death penalty sentence unconstitutional under the Fifth, Sixth, Eighth and Fourteenth Amendments due to the similarity of mental illness in terms of mens rea and ultimate culpability to mental retardation. Ripkowski makes this argument as an extension of *Atkins v. Virginia*, 536 U.S. 304 (2002) (barring execution of mentally retarded offenders), and *Roper v. Simmons,* 543 U.S. 551 (2005) (barring execution of juvenile offenders).

The district court properly dismissed this claim for several reasons. The Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence. A federal court cannot create a new constitutional rule of criminal procedure on habeas review. *Teague v. Lane*, 489 U.S. 288 (1989). Further, if this court considered the issue on the merits, the Fifth Circuit has recognized the distinction between the mentally ill and the mentally retarded and has held that *Atkins* only protects the latter. *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006). COA is not warranted on this claim.

C.

Ripkowski makes several arguments arising from the fact that Texas enacted a life-without-parole option for capital sentencing juries after his conviction and after he filed his initial state habeas petition. The district court found this claim to be unexhausted because it was not presented to any state court.

10

No. 10-70021

On the merits, the change in the law on sentencing is no basis for relief on habeas. *Colvin v. Estelle*, 506 F.2d 747, 748 (5th Cir. 1975). To the extent Ripkowski argues that his sentence imposed without the life-without-parole option violates *Beck v. Alabama*, 447 U.S. 625 (1980), that argument is without merit. *Beck* held that due process requires that the jury be instructed on a lesser included offense if the evidence supports it. Ripkowski's jury had the option to impose a lesser sentence of life imprisonment with parole eligibility after 40 years, which was the lesser included offense and punishment under Texas law at the time of his trial. The lack of a life-without-parole option at the time of his trial does not implicate *Beck*. To the extent Ripkowski is arguing that current constitutional requirements establish that a death penalty imposed without the option of life-without-parole is unconstitutional, that argument would create a new rule of constitutional law and is barred by *Teague*. We decline to grant COA on this claim.

D.

Ripkowski claims that his sentence was given without providing the jury a meaningful way to express their view on his mitigating evidence and was therefore unconstitutional. At the commencement of the punishment phase of Ripkowski's trial, Ripkowski's counsel made a motion to exclude victim impact evidence. They argued that the availability of such evidence placed them in the untenable position of choosing between presenting mitigating evidence and opening the door for victim impact evidence, or not presenting mitigating evidence at all. The trial court denied the motion. As a result, Ripkowski waived the mitigation special issue in an effort to preclude victim impact testimony, leaving only the special issue on the question whether Ripkowski presented a future danger to society. Ripkowski argues now that the absence of the mitigation question at the punishment phase left the jury with no means of

11

expressing a reasoned moral response to his mitigation evidence and no way to decide if he should be within the narrow class of capital convicted persons who deserve to be executed rather than given a life sentence.

The district court found that the record indicates that Ripkowski knowingly and voluntarily, and with the advice of counsel, waived his right to present the jury with the special mitigation question. The district court also found that the Texas scheme does narrow the class of death eligible defendants by the narrow definition of capital murder - in this case, the murder of a child under the age of six - and the requirement of an aggravating factor - future dangerousness, citing *Jurek v. Texas*, 428 U.S. 262, 268-72 (1976). *Jurek* affirmed the Texas death penalty scheme, which at the time did not have the mitigation special question. Ripkowski is arguing that without the mitigation question, the jury had no means to give a reasoned response to his mitigation evidence. *See Penry v. Johnson*, 532 U.S. 782 (2001). In effect, he wants this court to protect him from the effect of his own trial decision to waive the mitigation issue, but raises no issue that the waiver was unknowing or involuntary. This argument has no merit.

E.

Finally, Ripkowski argues that his trial counsel was ineffective for allowing him to waive the mitigation issue in this case. The district court found that this claim was exhausted but credited the decision as trial counsel's strategy to waive mitigation to avoid having the prosecution present victim impact evidence. The state court record includes the affidavit of the trial attorneys regarding this decision. After seeing the outcome in the guilt phase and the impact on the jury of the state's evidence and argument, counsel debated the issue, discussed it with Ripkowski and decided that it was worth foregoing mitigation testimony to prevent the state from presenting victim impact testimony. As early as voir dire they had focused on future dangerousness as the

best means to help their client avoid the death penalty. Ripkowski participated in the discussions with counsel and in the decision and stated in open court his understanding and waiver after being admonished by the trial court of the consequences.

Ripkowski argues that the admonishments to him did not make it clear that "his mitigating evidence would be deprived of a vehicle for use by the jury and, moreover, could only be given aggravating weight by the jury in looking at whether his mental illness or drug problem for example would make him more or less likely to be a future danger." The record refutes this argument. Before allowing Ripkowski to waive the mitigation issue, the trial court told Ripkowski "You understand now that if the jury answers the first Special Issue in the affirmative, by law I will then assess your punishment at death and the jury's not going to have an issue as to mitigation or any reason why it should lower the punishment simply by answering that special issue." Ripkowski responded that he understood and that was the way he wanted to do it.

In order to establish a claim of ineffective assistance, "a defendant must demonstrate that 'counsel's representation fell below an objective standard of reasonableness,' with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). If counsel was ineffective, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "An attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, 'are virtually unchallengeable.'" *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994), quoting *Strickland*, 466 U.S. at 691.

COA is not warranted on this issue.

No. 10-70021

V.

Ripkowski fails to establish the denial of a clearly established constitutional right to justify reversal of the district court's order granting summary judgment to the state and dismissing his claims.  For the foregoing reasons the judgment of the district court is affirmed.  AFFIRMED.