Patrick G. ZBUKA, Plaintiff,

v.

**MARATHON ASHLAND PETROLEUM, LLC, Defendant.**

No. 3:04CV7754.

United States District Court, N.D. Ohio, Western Division.

Aug. 23, 2006.

Michael T. Conway, Brunswick, OH, for Plaintiff.

Kimberly B. Schroeder, Marathon Ashland Petroleum, Lisa A. Lay, Marathon Ashland Petroleum, Findlay, OH, Natalie M. Hostacky, Patricia A. Shlonsky, Yelena Boxer, Ulmer & Berne, Cleveland, OH, for Defendant.

## ORDER

CARR, Chief Judge.

This is a case alleging interference with an employee's pension rights. Plaintiff

Patrick G. Zbuka sues his former employer, Marathon Ashland Petroleum (Marathon), for allegedly interfering with his attainment of full pension benefits in violation of § 510 of the Employee Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. § 1001 *et seq.*

Jurisdiction exists under 28 U.S.C. § 1331.

Pending are Marathon's motion for summary judgment and Zbuka's motion to strike Marathon's reply memorandum. For the reasons that follow, Marathon's motion is granted and Zbuka's motion is denied.

### Factual Background

Zbuka became a wastewater treatment operator in 1979 at the Canton, Ohio, refinery of Ashland Oil Company (Ashland). He became an employee of his current employer, Marathon Ashland Petroleum, when Ashland Oil formed a joint venture with the Marathon Oil Company in 1998. Zbuka's last day of employment was June 8, 2004. He contends Marathon disciplined him and ultimately forced him to retire to prevent him from obtaining a full pension.

Marathon's pension plan provides for full retirement benefits at or after age

sixty-two if the employee had at least 37½ years of plan participation. Zbuka would not have had 37½ years of plan participation until 2017. Therefore, when Marathon fired Zbuka on June 8, 2004, he had thirteen years before he would have been eligible for full retirement benefits.

The company's plan provides for early retirement at age fifty if the employee has ten years of service. Zbuka was eligible for early retirement four years prior to his last day at work. Zbuka currently is eligible for a pension of $1,700 per month.[1]

Marathon states it forced Zbuka out of his job because he caused numerous workplace incidents over a three-and-half-year period that began in 2001 and ended in 2004. (Doc. 20 at 2).

Marathon fired Zbuka on June 8, 2004, after he contaminated two fuel tanks on May 24, 2004.[2] One of the contaminated fuel tanks affected ten truckloads of gasoline delivered to fourteen gas stations. Zbuka's action resulted in the closure of gas stations and thousands of dollars of damage. As a result of the incident, Marathon had to pump out more than 124,000 gallons of contaminated fuel that was delivered to the stations and reformulate it. The contamination incident occurred four days after Zbuka had tried to cover up a basin overflow by hosing bacteria-filled material down a sewer.[3]

---

1. Zbuka began as an employee of Ashland, but Marathon ensured that such employees were not penalized and received pension benefits as if they had worked their entire career at Marathon. The details of the Ashland and Marathon plans do not affect the outcome of this case.

2. Zbuka was given the option to either retire or be fired. I use the terms, "fired," "forced resignation," and "retirement" in various parts of this opinion. In any event, regardless of the particular term, Zbuka was involuntarily removed from his job at Marathon.

3. The statement of Steve Towell, product control manager at the Canton refinery, best summarizes the situation regarding Zbuka:

 In June of 2004, I made the decision to terminate Plaintiff once [Marathon] had exhausted the progressive discipline process with Plaintiff by disciplining him for failing to check his equipment, causing two designated environmental incidents (DEIs) and two near misses, and contaminating two fuel tanks resulting in closure of gas stations and thousands of dollars in damage. I was concerned that retaining Plaintiff as an employee could jeopardize the safety of

Zbuka had a history of making such mistakes, dating back to early 2001. All of Zbuka's mishaps were documented in his personnel file. *(See* Exs. B–G). Marathon states the mistakes Zbuka made involved routine job tasks for which he was adequately trained.

Prior workplace infractions included:

· On January 15, 2001, Zbuka received a written warning for failing to check his work area and equipment for two shifts;

· On August 23, 2001, Zbuka allowed a tank to reach a pH as low as 4.65, which could potentially have caused the entire wastewater plant to fail. The low pH level was discovered by the operator following Zbuka's shift. Zbuka received a one-day suspension;

· On March 15, 2002, Zbuka failed to discover the poor condition of water in sand filters and effluent water, which resulted in a designated environmental incident (DEI). Again, the operator following Zbuka's shift discovered the problem. Zbuka received a three-day suspension;

· On December 12, 2002, Zbuka opened the block valve on a tank and drained its contents, causing a DEI. (Zbuka was supposed to have been circulating the contents of the tank). Zbuka received a five-day suspension and was informed—in writing—that another incident would result in his firing.

As a result of the foregoing incidents, Marathon supervisors had gone through the company's progressive disciplinary process when they decided to meet with Zbuka and his union representative, Henry Ash, on June 8, 2004. Supervisors told Zbuka that, based on the two most recent

the Canton refinery, personnel, and/or community.
(Doc. 20–2, Steve Towell Dep.).

incidents and a history of workplace problems, they were firing him. Ash asked if Zbuka could retire instead of being fired, and the supervisors agreed to let Zbuka retire.

Zbuka left the meeting to discuss his options in a private caucus with Ash. During that caucus, Ash told Zbuka, *inter alia,* the union was willing to help fight his (Zbuka's) termination. Zbuka, however, opted to retire, and told supervisors of his decision after the caucus.

In his lawsuit, Zbuka claims the various workplace mishaps were not his fault and contends "he is being blamed for problems caused by managerial shortcuts and a failure to train him in unorthodox procedures, and [a failure] to fix known equipment problems." (Doc. 24 at 6). Zbuka claims his supervisors knew he "was not personally at fault for any alleged violation of work rules or company procedures" and forced him to retire because they wanted to interfere with his ability to attain a full pension. (Compl.¶ 5).

Furthermore, Zbuka claims that his employer led him to believe that he would lose pension benefits if he was fired and did not elect to retire. (Pl.'s Aff. ¶ 9). Marathon allegedly misled Zbuka "through a failure to accurately inform [him] of what [his] pension benefits would be prior to[. . .] accepting the retirement over termination option." (Pl.'s Aff. ¶ 9). Thus, Zbuka claims Marathon human resources (HR) officials improperly breached their fiduciary duty to him (imposed on pension plan managers by ERISA[4]) by remaining silent and not fully informing him of his pension rights. (Doc. 24 at 4).

4. I will assume, for the sake of this motion, that the HR officials were pension plan managers and therefore ERISA fiduciaries although Marathon notes there is reason to doubt such legal conclusion.

## Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In viewing the evidence, I must draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Best v. Cyrus*, 310 F.3d 932, 934 (6th Cir.2002); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir.2001). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bell v. Marinko*, 367 F.3d 588, 591 (6th Cir.2004) (citing *Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir.2004)).

### 1. Motion to Strike Marathon's Reply

■ Zbuka moves to strike Marathon's reply memorandum on the grounds that it "attempts to treat [Zbuka] as having moved for summary judgment in his own right and raises issues not preserved by affirmative defenses in the Answer to the Complaint." (Doc. 34 at 1). Zbuka cites no authority for his motion: his memorandum cites no case in which a district court granted a motion to strike on similar grounds. In any event, Marathon's reply memorandum does not treat Zbuka as having moved for summary judgment. Zbu-

ka's motion to strike Marathon's reply also is groundless, as it relates to an affirmative defense Zbuka claims Marathon waived.

### 2. Section 8 of National Labor Relations Act [NLRA]

Zbuka repeatedly asserts that he lost the right to grieve his termination because he opted to retire, instead of being fired. In particular, Zbuka alleges Marathon forced him to retire so he would have no recourse to protect his pension rights.

Zbuka's retirement affected his ability to grieve under the CBA: only members of the collective bargaining unit can file a grievance under the CBA; retirees are not members of the unit. (Angie Long Dep. 54–55).

Zbuka was fired on June 8, 2004. Marathon employees can only retire on the first of a given month. Zbuka took unpaid absence leave from June 8th until July 1, 2004. Zbuka was a member of the collective bargaining unit until that date, however, and could have grieved his treatment by Marathon any time before then.(Angie Long Dep. 55). Thus, Zbuka's decision to retire decreased, but did not eliminate entirely the period during which he could have filed a grievance.

That said, Zbuka's union representative, Ash, not Marathon officials, first brought up the idea of retirement in lieu of firing. *(See* Doc. 33–3; Def.'s Ex. G). There is no evidence in the record that Marathon officials coerced or tricked Zbuka into choosing retirement over being fired.[5]

---

5. Zbuka states that—regardless of who suggested retirement—Marathon human resources officials had a duty to inform him fully of his pension rights before he agreed to retire. That may be so, but there is still no evidence that Marathon officials cared whether Zbuka retired or was fired; they merely wanted to get rid of (what they thought was) an incompetent employee. Nothing indicates Marathon officials preferred that Zbuka retire.

Lastly, even if Marathon forced Zbuka to resign so he could not grieve his firing, that would not give rise to a § 510 interference claim. An employer's interference with a grievance right is an unfair labor practice under § 8 of the NLRA. 29 U.S.C. § 160; 51 A *Corpus Juris Secundum—Labor Relations* § 429 (An employer commits an unfair labor practice by engaging in conduct that "interferes with, restrains, or coerces employees in the exercise of their guaranteed rights" under the NLRA, which provide the framework for employer relations with the collective bargaining unit and the establishment of employer-union CBAs.). Unfair labor practices are within the exclusive jurisdiction of the National Labor Relations Board; this court lacks subject matter jurisdiction for such claims. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

Zbuka argues in his motion to strike that Marathon waived arguments that Zbuka's claim is preempted by § 8 because Marathon did not raise preemption as an affirmative defense in its answer.

Zbuka's complaint, however, did not contend Marathon interfered with his right to grieve his termination under the CBA. Zbuka only raised that argument in his memorandum in opposition to Marathon's motion for summary judgment. *(See* Doc. 24 at 1–2). Marathon has the right to reply to arguments raised in Zbuka's opposition. *See* Loc. R. 7.1.

Thus, Marathon may respond to Zbuka's opposition memorandum allegations that Marathon interfered with his ERISA rights by orchestrating a way to prevent him from filing a grievance under the CBA. Its response that this court does not have subject matter jurisdiction to address unfair labor practices is, moreover, correct. Allegations that Marathon interfered with Zbuka's right to file a grievance cannot support an ERISA interference claim. Zbuka's motion to strike is unwarranted on this ground as well.

In any event, Marathon's argument here does not affect the outcome. Zbuka's claim would fail even if the NLRA did not preempt claims based on alleged employer interference with grievance rights because, for the reasons that follow, Zbuka fails to establish a *prima facie* case of ERISA interference and cannot prove Marathon's proffered reason for firing him was a pretext.[6]

### 3. Section 510 Interference Claim

Zbuka alleges Marathon violated § 510 of ERISA, 29 U.S.C. § 1140, which provides:

> [I]t is unlawful for any person to discharge, fire, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled the provisions of an employee benefit plan [ . . . ] or for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan.

29 U.S.C. § 1140

Congress passed ERISA "primarily [to] prevent[ ] unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980); *Mattei v. Mattei,* 126 F.3d 794, 798–801 (6th Cir.

---

6. For the analysis that follows, I assume that preemption does not apply to Zbuka's argument that Marathon forced him to retire in 2004 to prevent him from: 1) attaining full pension benefits in 2013 (Compl.¶ 9); and 2) being able to grieve his firing under the CBA to protect his pension rights. (Pl.'s Aff. ¶ 9).

1997) (explaining legislative history of ERISA and the *West* decision).

■ ERISA prohibits employers from: 1) retaliating against a person who avails himself or herself of an ERISA right; and 2) interfering with the attainment of ERISA rights. *Coomer v. Bethesda Hosp.,* 370 F.3d 499, 506 (6th Cir.2004).

■ The plaintiff must show that the employer "had the specific intent of avoiding ERISA liability when it discharged him." *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113 (6th Cir.2001); *Abbott v. Pipefitters Local Union No. 522,* 94 F.3d 236, 242 (6th Cir. 1996) (holding that, to establish a *prima facie* case of § 510 interference, a plaintiff "must demonstrate that the action at issue was taken with the specific intent to violate ERISA, i.e., that a motivating factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits").

This is an interference claim because Zbuka alleges Marathon fired him to prevent him from attaining ERISA rights.

Zbuka bases his § 510 claim on the fact that: 1) he was unaware of his pension rights at the time of his forced retirement; 2) he believed—incorrectly—he would lose pension rights if he did not agree to retire; and 3) HR officials violated their fiduciary duties to fully inform him of his pension rights before he made his decision to retire. *(See* Doc. 24 at 3–4). Zbuka also alleges that the failure to inform him of his pension rights led him to waive his right to challenge his termination—and thereby protect his pension rights—with a grievance under the CBA. *(See* Doc. 24 at 5).

■ Zbuka seeks to establish his *prima facie* case through indirect evidence. With cases supported by indirect evidence, courts employ a burden-shifting approach in which the plaintiff must first establish a *prima facie* case, after which the defen-

dant has the burden of production to present legitimate reasons for its actions. *Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043–44 (6th Cir.1992); *Cupp v. Fluor Fernald, Inc.,* 2006 WL 462446, *9 (S.D.Ohio, Feb.24, 2006); *Soliday v. Fluor Fernald, Inc.,* 2006 WL 143381, **7–8 (S.D.Ohio, Jan.18, 2006). If the defendant rebuts the plaintiff's allegations, the plaintiff must produce evidence sufficient to persuade the trier of fact that the defendant's proffered reason is pretextual. *Humphreys,* 966 F.2d at 1043–44.

■ To establish a *prima facie* case of § 510 interference, the plaintiff must show: 1) prohibited employer conduct 2) motivated by intent to interfere 3) with attainment of a pension right. *Smith v. Ameritech,* 129 F.3d 857, 865 (6th Cir. 1997).

■ I assume, *arguendo,* that Zbuka satisfies the first and third elements of the *prima facie* case because the second element—causation—is lacking and therefore dispositive.

■ "The second element requires the presentation of a causal connection between the termination and the reduction in pension benefits." *Cupp,* 2006 WL 462446 at *9 (citing *Pennington v. W. Atlas, Inc.,* 202 F.3d 902, 906 (6th Cir.2000)). A plaintiff need not prove the employer's sole purpose was to violate ERISA; such a motive need only have been "a determining factor in the decision." *Id.*

■ Close temporal proximity helps establish causation. *Humphreys,* 966 F.2d at 1043–44; *Cupp,* 2006 WL 462446 at *9; *Soliday,* 2006 WL 143381 at *8. A gap of several years between the adverse employment action (such as a firing) and the attainment of ERISA rights is, without "additional highly probative facts that suggest intentional discrimination [...] too great to be the basis of a *prima facie*

case." *Petrus v. Lucent Technologies, Inc.*, 102 Fed.Appx. 969, 971 (6th Cir. 2004).[7]

In *Petrus*, 102 Fed.Appx. at 971, the court held that an employee failed to establish a *prima facie* violation of § 510 where her employer transferred her to another division two years short of retiring with a full pension. *Id.* (stating that the court has "not allowed plaintiffs to make out a submissible case by pointing to temporal gaps of this size").

Zbuka argues his *"prima facie* case is not based upon proof of temporal proximity between [his] eligibility for full retirement benefits and plaintiff's termination date so as to infer an intent by the employer to defeat benefits." (Doc. 24 at 11). This concession is understandable because the date on which Zbuka would have become eligible for full pension benefits was extremely remote—thirteen years from his last day at work.

While Zbuka need not base his case on temporal proximity, he must, in the absence of such evidence, produce "additional, highly probative facts that suggest intentional discrimination" if he is to show Marathon most likely fired him with the specific intent of preventing him from attaining full pension benefits. *Petrus*, 102 Fed.Appx. at 971.

Because the record lacks facts that are "highly probative" of intentional discrimination, his claim fails. The record is void of any indication Marathon fired Zbuka to stop him from attaining full pension benefits. Marathon supervisors did not force Zbuka to retire; they would have been content to fire him, and Zbuka has presented no evidence indicative of any motivation for his discharge other than his

poor, and indeed, potentially dangerous, performance of his duties.

Instead of evidence, Zbuka offers only unsubstantiated, self-serving assertions that he was not at fault for the most recent workplace incidents. Even if I assume—despite his complete lack of evidence—Zbuka's claims are correct and he was not to blame for the numerous mishaps, that only shows Marathon should not have fired him. That does not, however, prove his supervisors terminated him with the specific intent to violate ERISA. In any event, the evidence indicates Marathon supervisors honestly believed Zbuka was a problem employee with whom they had exhausted the company's progressive discipline.

That HR officials did not inform Zbuka about the specifics of his early retirement benefits before he made his decision is not—especially in light of his extensive disciplinary record—evidence of Marathon's specific intent to interfere with his pension rights. Nothing suggests the HR officials who conducted Zbuka's exit interview specifically intended to prevent his attainment of pension rights. The HR officials who Zbuka alleges failed to inform him of his pension rights were not the same people as the supervisors who disciplined him. The HR officials had no reason to doubt that Zbuka was anything but what his personnel file portrayed him as: an incompetent employee. Zbuka produces no evidence showing HR officials conspired with supervisors to violate ERISA.

 Zbuka argues that his disciplinary incidents prior to 2004 are "irrelevant to the analysis of my case." (Doc. 24–2 at 3).

**7.** Zbuka claims that Marathon misinterprets *Petrus*. (Doc. 34 at 3–4). I disagree. The language in *Petrus* is clear: a plaintiff who seeks to show a § 510 interference claim in a situation where a significant gap exists between full pension eligibility and the adverse employment action must show "additional, highly probative facts" indicative of the employer's specific intent to violate § 510.

Not so: terminating an employee via progressive discipline is reasonable. An employer may legitimately fire an employee based on negative information in his or her personnel file. *See, e.g., Reid v. Rexam Beverage Can Co.*, 434 F.Supp.2d 500, 507 (N.D.Ohio 2006).

Thus, consideration of Zbuka's entire disciplinary history is proper in analyzing his case.

Zbuka has no independent evidence that his firing was anything other than what it appeared to be—the inevitable and understandable conclusion of an employment history checkered with disciplinary warnings and suspensions.

Even if I were to consider only the two most recent disciplinary incidents, the outcome does not change. There is no evidentiary basis on which a rational trier of fact could find that it was more likely than not that Marathon fired Zbuka in 2004 with the specific intent of preventing him from attaining benefits in 2017.

Furthermore, Zbuka cannot contend that his firing prevented him from accruing a greater percentage of partial pension benefits: case law precludes that assertion. *See Majewski*, 274 F.3d at 1113 (holding that merely demonstrating an employee "lost the opportunity to accrue new benefits" through more years of employment does not establish a *prima facie* case); *Bingaman v. Procter & Gamble*

Co., 2005 WL 1579703, *8 (6th Cir. July 6, 2005).[8]

█ Specifically,

A plaintiff does not state a prima facie case of § 510 interference if the plaintiff demonstrates only that he lost the opportunity to accrue new benefits … Otherwise, every employee discharged by a company with an ERISA plan would have a claim under § 510.

*Majewski*, 274 F.3d at 1113.

█ A plaintiff must present evidence showing that the employer "encouraged him to resign or accepted his resignation in order to prevent him from making a claim for employee benefits." *Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 242 (6th Cir.1996); *Coomer*, 370 F.3d at 506 (stating that a § 510 interference claim requires proof that the employer acted with the intent to stop the employee from attaining an entitlement).

Both *Majewski* and *Bingaman* addressed the kind of indirect evidence needed to show such an employer had the specific intent to violate ERISA. *See, e.g., Majewski*, 274 F.3d at 1113 (plaintiff must show "not only that he lost the opportunity to accrue new benefits, but also that [the employer] had the specific intent of avoiding ERISA liability when it discharged him"); *Bingaman*, 2005 WL 1579703 at *8 (quoting *Majewski* and determining that plaintiffs "failed to produce any evidence

---

**8.** Zbuka insists he is not arguing that he only lost the opportunity to accrue new benefits. That may be so, but under Zbuka's theory of the case—that HR officials violated their fiduciary duty to him because they did not tell him details of his early retirement benefits before he agreed to retire—it does not appear that Marathon acted with the specific intent to violate ERISA. Zbuka would have received the same early retirement benefits regardless of whether he was fired or agreed to retire. Zbuka's supervisors did not seem to care whether he retired or was fired, so long as he immediately stopped being a Marathon employee.

Additionally, Zbuka claims the fact that the date on which he could retire was many years off goes to the damages he would receive, and not to whether he has stated a § 510 claim. That argument does not help Zbuka. Temporal proximity is one indicator of an employer's specific intent to violate ERISA. It is especially difficult to overcome the remoteness of temporal proximity if—as is the case here—there are no other indicators of improper employer intent.

from which a reasonable jury could infer that [the employer] terminated their employment [ . . . ] to avoid having to provide [p]laintiffs with ERISA benefits").

In both cases, the Sixth Circuit held that plaintiffs who only show that their firings deprived them of the chance to "accrue new benefits" fall short of providing the kind of evidence needed to show specific intent for a § 510 interference claim. *See Majewski*, 274 F.3d at 1113; *Bingaman*, 2005 WL 1579703 at *8.

A § 510 claim needs more evidence of an employer's specific intent to violate ERISA than the fact that—had the employee not been fired—more benefits would have accrued as a result of the passage of time. *See, e.g., Bingaman*, 2005 WL 1579703 at *8.

Zbuka does not, therefore, show evidence of Marathon's specific intent to interfere with his ERISA rights under the theory that he would have been entitled to an incremental increase in partial benefits had his employment continued. *See id.* To rule otherwise would, as the Sixth Circuit observed in *Majewski*, 274 F.3d at 1113, drastically expand the scope of ERISA and make almost every firing at a company with an ERISA plan a § 510 violation. *Id.*

As I noted earlier, *supra*, Zbuka's other arguments—that HR officials abused their fiduciary duty to him—are not borne out by anything in the record.

Therefore, Zbuka fails to establish causation: he lacks evidence that Marathon's specific intent to deprive him of ERISA rights caused or in any way motivated his firing.

### 4. No Evidence of Pretext

Even if, however, Zbuka was able to establish a *prima facie* case, his claim would still fail because he, as has already been alluded to above, cannot prove that Marathon's proffered reason for firing him

(namely, his lengthy disciplinary record) is a pretext.

Marathon has articulated a legitimate, lawful reason for terminating Zbuka: incompetence, as evidenced by his numerous mistakes (in turn documented in his personnel file). Thus, under the burden-shifting framework applied to ERISA cases, Zbuka must rebut this reason by showing it is a pretext for Marathon's specific intent to violate ERISA.

The same analytical framework for determining pretext in employer discrimination claims applies to ERISA interference claims. *See Pennington v. W. Atlas, Inc.*, 202 F.3d 902, 909–10 (6th Cir. 2000) *cert. denied* 531 U.S. 826, 121 S.Ct. 74, 148 L.Ed.2d 38 (2000) (applying *Manzer v. Diamond Shamrock*, 29 F.3d 1078, 1083–84 (6th Cir.1994) and *Kline v. Tennessee Valley Auth.*, 128 F.3d 337 (6th Cir.1997) to issue of employer pretext in an ERISA interference claim).

A plaintiff can demonstrate pretext by presenting evidence that the proffered reason: 1) had no factual basis; 2) did not actually motivate the employment action; or 3) was insufficient to justify or cause the discharge. *Pennington*, 202 F.3d at 909; *Reid v. Rexam Beverage Can Co.*, 434 F.Supp.2d 500, 506 (N.D.Ohio 2006). To rebut an employer's proffered reason as pretext, "the plaintiff may not rely simply upon his *prima facie* evidence but must, instead, introduce additional evidence." *Pennington*, 202 F.3d at 909.

Importantly, a plaintiff cannot satisfy the burden of proving employer pretext by simply questioning the employer's business judgment. *Majewski*, 274 F.3d at 1116–17; *Reid*, 434 F.Supp.2d at 506. That is because "[i]f an employer honestly believes the articulated [ . . . ] reasons for an adverse employment action, a court will not consider those reasons pre-

textual merely because that reasoning is later proven incorrect." *Reid,* 434 F.Supp.2d at 506–07 (citing *Majewski,* 274 F.3d at 1117). Federal courts cannot second guess employers' business judgments. *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 462 (6th Cir.2004).

■ The first method of showing pretext requires evidence that the alleged incidents resulting in "the plaintiff's discharge never happened." *Pennington,* 202 F.3d at 909. That is not the case here: Zbuka admits he was disciplined and that mistakes occurred, although—for the 2004 incidents—he attempts to shift the blame onto his supervisors for failing to monitor and train him.

Despite Zbuka's suggestion to the contrary, his entire disciplinary record is relevant to the analysis; that is the information his supervisors had before them when they decided to fire him.

Marathon documented problems with Zbuka's job performance dating back to early in 2001. Zbuka does not try to disprove Marathon's account of the disciplinary incidents prior to 2004. Because Zbuka only argues he is not at fault for the incidents that immediately preceded his June 8, 2004, firing, he does not fully rebut Marathon's reason for terminating him.

Furthermore, in arguing that he is not at fault for the 2004 incidents, Zbuka misses the point. The issue is not whether Marathon was correct, *i.e.,* whether Zbuka caused the incidents on which his termination was based. The issue is whether Marathon honestly believed Zbuka was at fault for those incidents. *Majewski,* 274 F.3d at 1117. If Marathon honestly believed Zbuka was at fault, Zbuka does not prove pretext merely by arguing that Marathon was incorrect because others were more to blame. I cannot, moreover, second guess Marathon's business judgment and hold that Zbuka's mistakes did not warrant firing.

Despite Zbuka's unsupported assertions that his supervisors should have better trained and supervised him, no evidence exists in the record showing that Marathon officials did not believe the proffered reason for firing him.

■ The second method of proving pretext is indirect and involves "showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant" because "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext." *Pennington,* 202 F.3d at 909.

As mentioned earlier, *supra,* Zbuka attempts to make the circumstances surrounding his termination seem improper by arguing Marathon forced him to retire so he could not later challenge his firing—and protect his pension rights—through the grievance process. Zbuka also emphasizes he was not informed about the details of his pension benefits before he agreed to retire.

Again, those arguments are without merit. Nothing that occurred on the day of Zbuka's termination "makes it more likely than not that the employer's explanation is pretext." *Id.* By all appearances, the desire to get rid of a bad employee motivated Zbuka's supervisors; nothing indicates supervisors cared—or even knew—about the specifics of the pension benefits he would receive. Thus, any impact on plaintiff's pension rights could not have motivated the decision to terminate him.

Here, the "sheer weight of the circumstantial evidence," *Pennington,* 202 F.3d at 909, indicates Zbuka's supervisors sincerely believed they were firing a poor employee.

■ Lastly, the third and final means of demonstrating pretext typically is with

evidence that other employees were treated more favorably while engaging in substantially identical conduct to that which allegedly motivated the adverse employment action. *Pennington,* 202 F.3d at 909.

Zbuka does not attempt to use the third method of proving pretext because he does not refer to any other employees who were similarly situated but treated more favorably.

In summary, Zbuka fails to prove Marathon's proffered reason for firing him is a pretext. As such, even if Zbuka were able to establish a *prima facie* case, his claim would still fail because he cannot rebut Marathon's legitimate, proffered reason for firing him.

### Conclusion

It is therefore,

ORDERED THAT

1. Zbuka's motion to strike Marathon's reply be, and the same hereby is denied; and

1. Marathon's motion for summary judgment be, and the same hereby is granted. So ordered.